The COMMISSIONERS OF HIGHWAYS OF the TOWNS OF ANNAWAN, ET AL., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants, Cross Claimants and Third-Party Plaintiffs,

v.

Daniel WALKER, Individually and as Governor of the State of Illinois, et al., Defendants and Cross-Defendants,

v.

The STATE OF ILLINOIS, Third-Party Defendant.

No. 74 C 1861.

United States District Court, N. D. Illinois, E. D.

Feb. 23, 1979.

Ellen Claire Newcomer, Ronald Butler and James I. Rubin, Winston & Strawn, Chicago, Ill., for plaintiffs.

Herbert L. Caplan, First Asst. Atty. Gen., John L. Gubbins, Asst. U. S. Atty., Chicago, Ill., for defendants.

LEIGHTON, District Judge.

Memorandum *

This litigation arises from a dispute concerning the obligation of the United States to maintain highway bridges over the Illinois-Mississippi Canal in accordance with congressional legislation and certain condemnation decrees of this court. Plaintiffs are the Commissioners of Highways of the Towns of Annawan, Alba, Atkinson, Coloma, Colona, Concord, Edford, Fairfield, Gold, Geneseo, Montmorency, Mineral, Tampico, and Wyanet, all of them original parties to these decrees; and the Counties of Bureau, Henry, and Whiteside with whom the Commissioners share the rights and obligations of the towns within their borders for maintenance projects costing more than $1,000. The defendants are the United States, certain federal agencies and their officials. They have controverted the allegations of the complaint, filed a cross-claim, and have brought the State of Illinois into the controversy as a defendant in a third party complaint. The cause has been submitted to the court on an agreed statement of facts [1] which reveal that this dispute has developed from events involving more than one hundred years of Illinois history. For an understanding of the issues presented, it is necessary that this history be recounted.

## I. History of the Dispute

### A. Construction of the Illinois-Mississippi Canal

Expansion of the population and economy of the Northwest Territory and neighboring states in the nineteenth century created interest in a canal linking the Illinois and Mississippi rivers. Such a canal, it was believed, would provide a short, direct water route for commercial purposes between these two important waterways and thus furnish an economical means of transportation for the areas near the rivers and the Great Lakes. In response to this need, the United States in 1870 made the first of a series of surveys to determine the best route for the canal. The Secretary of War conducted additional studies and economic evaluations of the proposed canal pursuant to Acts of Congress adopted in 1882 and

---

* Review of this voluminous record, the underlying research, and preparation of the original draft of this Memorandum, were the work of Louis Michael Bell, Esq. who while a third-year student at the University of Chicago Law School served as an Extern in these Chambers. This court wishes to acknowledge its indebtedness to Mr. Bell for his invaluable assistance. The quality of his work displays sound legal education and innate abilities as a lawyer.

1. Plaintiffs and the federal defendants filed a Stipulation of Facts on October 29, 1976. Then, the plaintiffs served on the state defendants two requests for admission of facts on August 9 and 20, 1976. The facts stated in these requests were substantially identical with those in plaintiffs' stipulation with the federal defendants. The state defendants did not respond and therefore admitted that the facts as stated by the plaintiffs are true. Rule 36(a), Fed.R.Civ.P.

1886.[2] In 1888, Congress authorized the Secretary of War to locate an Illinois-Mississippi Canal between Hennepin, Illinois and the Mississippi River north of Rock Island. He was directed to submit detailed plans and estimates for construction.[3] The Secretary submitted a preliminary report two years later.[4] In the River and Harbor Act of September 19, 1890,[5] Congress authorized $500,000 for construction of the canal; and in 1892, authorized $500,000 which included funds for acquiring rights of way for the project.[6]

The 1890 Act directed the Secretary of War to acquire title to necessary lands by agreement, purchase, or voluntary conveyance from the owners, or by condemnation in this court, through proceedings governed by Illinois law.[7] The 1892 Act added two important provisos:

"That in acquiring right of way the Secretary of War may make agreements for joint user [sic] where the canal crosses other lines of transportation if such agreements can be made upon reasonable terms: *Provided further,* That in acquiring the right of way by agreement or otherwise for the crossing of existing public highways over the parts of the canal constructed on land, the basis of agreement or condemnation shall be construction and maintenance of bridges by the United States Government, as provided for in the detailed plans and estimates heretofore submitted to Congress, but this provision shall not apply to bridges constructed over public waters of the United States now occupying part of the

line of the said canal, nor to bridges constructed after the completion of said canal or part thereof adjacent to the bridge sites."

Accordingly, the United States initiated certain judicial proceedings in this court to obtain the right of way for the canal. These were suits for condemnation, *United States v. Cass,* No. 8913 (1896); *United States v. Maxson ("Maxson I"),* No. 9118 (1898); *United States v. Galt,* No. 9139 (1898); *United States v. Howes,* No. 9167 (1899); and *United States v. Rickel,* No. 377 (1900), (hereinafter referred to as "the condemnation proceedings" or "the condemnation decrees" collectively). The condemnation petition in *Cass* is representative of the pleadings filed by the United States in the other cases. It alleged

"that the United States of America in the course of its construction of said canal will construct, erect and forever thereafter maintain bridges for use as public roadways and highways at and along each of said lots hereinabove designated . . .."

The final decree ordered and adjudged that the taking and use of certain lots, which were portions of public highways, were to be subject to the petitioner's "agreements and stipulations set forth in the Amendment to its petition filed in this Court on the 18th day of May, 1896." In the amendment referred to, the United States stipulated and agreed with the Commissioners of Highways of Wyanet and Concord "that it will at its own expense construct and main-

2. Act of August 2, 1882, ch. 375, 22 Stat. 191, 207–08; Act of August 5, 1886, ch. 929, 24 Stat. 310, 326.

3. Act of August 11, 1888, ch. 860, 25 Stat. 400, 419.

4. H.R.Exec. Doc. No. 316, 51st Cong., 1st Sess. (April 9, 1890).

5. Ch. 907, 26 Stat. 426, 449.

6. Act of July 13, 1892, ch. 158, 27 Stat. 88, 106.

7. "It shall be the duty of the Secretary of War, in order to secure the right of way for such canal and feeder, to acquire the title to such lands as may be necessary by agreement, pur-

chase, or voluntary conveyance from the owners, if it can be done on reasonable terms; but if that should be found impracticable, then the Secretary of War shall apply at any term of the circuit or district court of the United States for the northern district of Illinois to be held thereafter, at any general or special term held in said district, and in the name of the United States institute and carry on proceedings to condemn such lands as may be necessary for the right of way as aforesaid; and in such proceedings said court shall be governed by the laws of the State of Illinois, so far as the same may be applicable to the subject of condemning private property for public use . . . .." 26 Stat. at 449.

tain iron or steel bridges" on the named lots. The court decree awarded the Commissioners of Highways one dollar for each such lot taken "in full satisfaction of all compensation to which they are entitled."

The decrees in *Maxson I, Galt, Howes,* and *Rickel* were similar. In each case, the awards of one dollar for each portion of public highway taken were adjudged "full and just compensation." All four decrees contain the following formulaic language:

"And it is further ordered and adjudged by the court that the United States shall build and maintain good and sufficient ["substantial and suitable" in *Rickel*] bridges . . . over and across said Canal, at or near the line of the present ["upon the" in *Maxson I*] public highways crossing the same, described in this judgment as [list of pertinent lots], for the safe and convenient passage thereover at all times (except when said bridges are open for Canal traffic) of teams and vehicles."

These condemnation proceedings were brought by the United States to obtain rights of way as required for construction of the canal. Actual construction began after the first condemnation proceedings were initiated in 1892. By 1900, acquisition of the required land by condemnation had been completed, construction was well under way, and erection of the bridges had begun. In 1903, the Commissioners of Highways filed cross-petitions to the original condemnation proceedings in *Maxson I.* They claimed that the size, design, and location of bridges being built across the canal by the United States did not comply with the terms of the condemnation decree. Thereafter, the court's decree of February 9, 1906 "*Maxson II*", adopted and confirmed a Master's Report that contained the hearing of the cross-petitions. Among other things, the Master concluded that since the provisos of the 1892 Act, and the plans and specifications for construction of the

proposed bridges which were filed by the United States were presented to the jury,

"it will be presumed that the nominal compensation fixed by the jury's verdict was also based upon the obligation assumed by the Government to construct bridges in accordance with such plans and specifications and thereafter maintain the same at the several highway crossings condemned."

### B. Use and Maintenance of the Canal

The canal was completed and opened to navigation on October 24, 1907, replete with about 70 bridges that spanned highways over it. However, use of the waterway was disappointing from the outset, for a variety of reasons: railroads reduced their rates and improved bulk loading and haulage facilities; highways were improved and the trucking industry provided an additional, competitive means of transportation; newly developed vehicles for water transportation outstripped the capacity of the canal. Indeed, by 1930 it was so outmoded in comparison with water transportation facilities in use or under construction on the Illinois and Mississippi Rivers that Congress directed a study of the advisability and costs of its improvement.[8] The result was a 1938 Army Corps of Engineers recommendation

"that the existing obsolete canal be no longer maintained as a navigable waterway of the United States, but that for the present the right of way be retained by the United States for future canal improvement when justified and in order that the United States may fulfill its obligations with respect to certain bridges and for the protection of property adjacent to the pools."[9]

From this time the Corps began to consider formal abandonment of the canal. But because traffic on it increased substantially during World War II, this possibility was deferred.

8. River and Harbor Act of July 3, 1930, Pub. L.No. 520, § 2, 71st Cong., 2d Sess., 46 Stat. 918, 941.

9. Army Corps of Engineers document of January 6, 1943, entitled "Preliminary Analysis of Future Operation, Illinois and Mississippi Canal," at 4, quoting a memorandum of the Chief of Engineers.

After the war, at the direction of Congress,[10] the Corps undertook a review of previous reports concerning the waterway. At the same time, since traffic had again decreased radically, operation of the waterway was placed on a standby basis as an economy measure. Commercial and pleasure boat traffic was restricted; maintenance was "limited solely to the minimum required to prevent failure of the canal structure including the legal obligations to maintain bridges, culverts, aqueducts, fences, etc. . . ."[11] In February 1951, the Rivers and Harbors Board of the United States made a further study which recommended that improvement of the canal was not advisable. The Chief of Engineers of the Corps concurred and gave public notice that on July 1, 1951, the canal would close to through traffic. Minimal maintenance of the canal, and of bridges over it, began in 1945 and continued through August 1970 when pursuant to conveyance of the properties to the State of Illinois the Corps ceased all maintenance activities including those affecting the bridges.

**10.** River and Harbor Act of March 2, 1945, Pub.L.No. 14, § 6, 79th Cong., 1st Sess., 59 Stat. 10, 25 and 31.

**11.** Letter dated July 13, 1953, from Col. Nelson Leclair, Jr., District Engineer of the Corps, to Col. Delbert B. Freeman, Division Engineer. *See Hearings before the Subcomm. on Rivers and Harbors and the Subcomm. on Flood Control of the House Comm. on Public Works: Omnibus River and Harbor and Flood Control Act*, 91st Cong., 2d Sess. 219 (1970) (remarks of Gen. Richard Groves of the Corps).

**12.** Letter dated December 13, 1938, from the Chief Engineer of the State Division of Waterways to the Corps, quoted in the Corps document of January 6, 1943, *supra* note 9, at 3.

**13.** *E. g.*, Corps document of January 6, 1943, *supra* note 9, at 4.

**14.** *Id.* at 1. *E. g.*, Corps memorandum dated March 1, 1938, from Carleton E. Kelley, Attorney; Corps memorandum dated January 5, 1943, from Carleton E. Kelley, Senior Attorney, to Planning Section, Attention: Mr. M. C. Lorenz; Corps document dated April 11, 1956, from Col. John L. Wilson, District Engineer, to Division Engineer, Chicago, Illinois.

"For example, one of the more difficult and important problems that will be encountered

## C. Transfer of the Canal to Illinois

As early as 1938, when the Corps first recommended against improvement of the canal, the state of Illinois expressed an interest in "assum[ing] the obligations of the Federal Government" should the United States consider release of the canal properties in order to continue public ownership of "[t]his scenic strip of land extending almost halfway across the State."[12] During and after the war, the Corps considered a variety of proposals for abandonment of the canal, including its transfer to the State.[13]

All along, the Corps recognized the continuing obligation of the United States to maintain the 70 odd bridges "[w]hether the canal is completely or partially abandoned or whether the canal is maintained without provision for handling navigation."[14] The Corps was also aware by 1950 that the counties and townships traversed by the canal were not receptive to a transfer to the state if it meant their assumption of responsibility for maintaining the highway bridges.[15] The Illinois authorities undertook a study concerning conversion of the

in connection with the abandonment of the Illinois and Mississippi Canal and the disposal and/or transfer of the Government-owned lands and structures to the State of Illinois is the method or procedure whereby the Government will be relieved of all legal obligations incurred by reason of the various Court Decrees entered in the condemnation proceedings whereby the Government acquired title to the lands some 50 years ago. These legal obligations require, among other things, that the Government maintain in perpetuity at Government expense, 65 highway bridges. . . ." *Id.* at ¶ 5.
*See also* Department of the Army, Inspection Report: Corps of Engineers Bridges over Illinois & Mississippi Canal 2–3 (Rock Island District 1969).

**15.** In a preliminary plan for abandonment, the Corps's Rock Island District proposed replacement of all the bridges with earth fill (22 entirely, the rest with culverts for the water flow) "on the assumption that appropriate local agencies would be unwilling to accept responsibility for these obsolete structures which are now approaching the end of their expected useful life." Corps report dated December 8, 1950, from Rock Island District to Division Engineer, St. Louis, Missouri, at 5.

canal into a public recreation area. In 1953, the Illinois General Assembly formed the first Illinois-Mississippi Canal and Sinnissippi Lake Commission to study the feasibility of this project. That same year the I & M Commission recommended that the United States retain ownership of the canal and convert it to recreational purposes at federal expense. In 1954, the Corps drafted legislation concerning transfer of the canal and submitted it to the state. The proposed legislation provided in part that Illinois would specifically assume all legal obligations of the United States imposed by the condemnation decrees and hold the federal government harmless for any and all claims arising from those obligations. However, through its Attorney General, the state rejected the proposed legislation because of perceived state constitutional difficulties.

The Illinois General Assembly recreated the I & M Commission in 1955. The Commission met with federal, state, and local officials to negotiate an acceptable plan for transfer of the canal. One of the new Commission's first acts was to sponsor legislation authorizing the Departments of Conservation and of Public Works and Buildings to enter into formal agreement with the United States for transfer of the canal. The General Assembly enacted this legislation in 1955.[16] Its Section 4 provided in part:

> Upon acceptance of title to the Canal as aforesaid, the Canal shall become a State Park, under the care, control, supervision, and management of the Department of Conservation as provided by the laws of this State concerning the State park system, except that (a) each bridge which connects sections of a road which is part of the system of State highways, and any approach to such a bridge, shall become part of such system of State highways; (b) each other public road section or bridge, unless designated by the Department of Conservation as an access road or driveway of the Park, shall be

maintained by the governmental unit which maintains the road of which such section or bridge is a part . . . ." Ill.Rev.Stat. ch. 105, § 482d (1955).

Throughout this post-war period of negotiation between the United States and the State of Illinois, the counties and townships informed the negotiating parties that they were unwilling to accept responsibility for maintaining the bridges. At a public hearing held by the I & M Commission on March 19, 1956, county and township officials pointed out that the funds necessary to replace the canal bridges would be equivalent to their gasoline tax revenues for some 25 to 30 years and that accepting the bridges would impose an unjust hardship on each county and township involved. Representatives of the Corps attended the hearing and reported these remarks.[17] At an I & M Commission meeting on August 17, 1960, county and township officials similarly expressed their opposition to being burdened with the expense and costs of maintaining the bridges. A resolution by the Boards of Supervisors of Henry, Bureau, and Whiteside Counties dated September 13, 1960, was of similar tenor. And a resolution by the Whiteside County Regional Planning Commission, adopted March 17, 1970, urged the state to replace the bridges with earth fill and culverts and to expend bridge rehabilitation funds for recreational facilities.

By the River and Harbor Act of 1958, Congress authorized the Secretary of the Army (a) to acquire fee simple title to the canal and Sinnissippi Lake; (b) repair and modify the canal appurtenances so they would be suitable for public recreational use, "except bridges and roads, which the United States has maintained or has been obligated to maintain"; but directed that acquisition of title, repair and modification not commence before agreements were made with Illinois concerning the terms of transfer to the state; (c) convey the rail-

---

16. 1955 Ill. Laws 1305 (July 9, 1955); 1955 Ill. Laws 1799 (July 13, 1955) (codified in Ill.Rev. Stat. ch. 105, §§ 482a–482d).

17. Corps memorandum dated March 19, 1956, from August P. Rinell, Supervising Civil Engineer, to District files.

road bridges to the railroad corporations; (d) convey the canal to the State of Illinois; (e) enter into the abovementioned agreements with the State; and (f) appropriated $2,000,000 to carry out these directives.[18]

On December 14, 1960, the United States, acting through the Chief of Engineers of the Corps, entered into a written agreement concerning the canal with Illinois, acting through the state's Department of Conservation and its Department of Public Works and Buildings. Among other terms, the agreement provided that after the United States had completed certain land acquisition and rehabilitation projects, Illinois, subject to certain conditions, would accept transfer of all the United States' right, title and interest in the canal by quitclaim deed. Upon acceptance of the transfer, the United States was to have no further obligation with respect to the waterway.[19] The conditions included performance by the United States of the items of work set forth in Schedule A of the Agreement, within the limits of Congressional appropriations and according to the priorities set up in Schedule B. This Agreement was amended on December 30, 1963, December 16, 1964, and on April 27, 1971, to recognize additional rehabilitation priorities and to permit the expenditure of additional funds authorized by Congress. The amendments revised the work and priority schedules, but neither the original agreement nor any of the amendments provided for any work on the highway bridges. In 1962, Congress authorized the expenditure of an additional $800,000 by either the Corps or the state, on completion of the transfer, "for repair and modification of any Canal properties and appurte-

nances, notwithstanding the provisions of section 110(b)" of the River and Harbor Act of 1958.[20] Thus the stricture against work on the bridges did not apply to these additional funds.[21]

The United States proceeded to acquire real estate and perform substantial rehabilitation work on the canal pursuant to the River and Harbor Act of 1958. It executed a quitclaim deed dated October 13, 1967 conveying the Illinois-Mississippi Canal to the State of Illinois. The state Attorney General, on July 6, 1970, issued an opinion regarding the interests in the canal sought to be conveyed by the United States to Illinois. He stated that the United States was vested with fee simple title in each of the canal tracts subject, among other things, to the requirements for bridge maintenance in the original condemnation decrees. He expressed satisfaction with the United States' performance of its land acquisition and work obligations under the 1960 Agreement. The quitclaim was accepted in August 1970, and was recorded in five different Illinois counties in November and December of the same year.

### D. Condition of the Bridges During and After the Transfer

The United States performed only minimal maintenance on the bridges from 1945 to 1970; consequently, when the canal was transferred to Illinois, they were in a state of disrepair. The Corps had inspected them in October and December, 1969, and reported that

"The highway structures over the canal are more than sixty years old. They have

---

18. Pub.L.No. 85–500, § 110(a)–(f), 72 Stat. 297, 302–03 (July 3, 1958).

19. United States Contract No. DA–11–117–CI-VENG–61–130, at 3.

20. River and Harbor Act of 1962, Pub.L.No. 87–874, § 106, 76 Stat. 1173, 1179 (October 23, 1962) (amending § 110(f) of the River and Harbor Act of 1958, *supra* note 18 and text thereat).

21. Plaintiffs' Proposed Finding of Fact No. 44, accepted by the federal defendants, is to the effect that "there was no repeal of the provi-

sion that upon transfer of the canal to Illinois the responsibility of the United States would cease." This court, however, cannot adopt this finding, since construction of a statute is a question of law. Moreover, authorization of funds for work upon completion of the transfer, not excluding work on the bridges, is consistent with the recognition by Congress that the United States' obligations to maintain the bridges might not be fully satisfied by the transfer and previously authorized repairs and modifications. This is again adverted to below.

deteriorated structurally to a point requiring immediate maintenance if they are to remain in service. These bridges are, in many instances, unsuitable for a long-term maintenance or rehabilitation program and are, even if rehabilitated, inadequate according to current State secondary road requirements. It is concluded that use of the majority of bridges should be terminated as rapidly as possible. In addition, immediate steps should be taken to provide for the safety of the road users." [22]

Similarly, a 1966 report of the Illinois Department of Public Works and Buildings concluded:

"Since 1945, and most particularly since 1951, the Federal Government has effected only minimum custodial maintenance on an emergency basis of appurtenant structures on the canal. Such action has resulted in deterioration of these structures, particularly railroad and road bridges, to the point that the cost of repair o[r] rehabilitation of these structures is substantially greater than the costs that would have been incurred had normal maintenance and repair been exercised during this period." [23]

By late 1970, the Corps had not performed any of the rehabilitative work on bridges authorized by the 1962 River and Harbor Act. [24]

In the River and Harbor Act of 1970, [25] Congress again amended § 110(f) of the 1958 Act, increasing the 1962 authorization of $800,000 on completion of transfer to the State of Illinois to

"an additional sum of $6,528,000 to be expended for the repair, modification, and maintenance of bridges, title transfer, modification and rehabilitation of hydraulic structures, fencing, clearing auxiliary ditches, and for the repair and modification of other canal property appurtenances, notwithstanding subsection (b) of this section."

In the hearings on this legislation, Gen. Richard Groves of the Corps testified about the bridges in words virtually identical to those contained in the 1966 state report. [26] In recommending the increased authorization, the House Committee on Public Works noted that

"The State has assumed custodial maintenance of the canal, and has agreed to accept title to it with the understanding that the needed repair of existing facilities, including the Federally-owned and operated bridges across the canal, will be accomplished by the United States. . . . The Committee feels that it is appropriate that the Canal and its properties, including the Federal bridges, be put in good repair before being transferred to the State. . . . " [27]

---

22. Corps Inspection Report, *supra* note 14, at 10–11. Among many instances of the bridges' inadequacy, the report remarks:
"The final rating for each bridge's capability to carry AASHO–H Loadings was determined. No attempt was made to determine the most practicable modification to raise the assigned bridge ratings. None of the structures owned by the United States meet State secondary road requirements for loadings, sight distance, alignment, roadway width, etc." *Id.* at 4.
"The posted 8-Ton classification on canal bridges represents an original design vehicle configuration which produced effects less critical than those produced by an 8-Ton AASHO vehicle. Immediate posting of AASHO classifications is mandatory." *Id.* at 8.
"The bridges, located in the very center of an intense agricultural area, are frequently se-

verely overloaded. The inspection teams witnessed loads in excess of the posted load classifications crossing the structures at frequent intervals. . . . It must be noted . . . that observed crossings frequently caused considerable deflection." *Id.* at 9.

23. State of Illinois Department of Public Works and Buildings, Division of Waterways, Resume: Illinois-Mississippi Canal, History and Status 18 (1966).

24. *1970 Hearings, supra* note 11, at 219.

25. Pub.L. 91–611, § 109, 84 Stat. 1818, 1821 (December 31, 1970).

26. *Supra* note 11, at 219.

27. H.R.Rep.No. 91–1665, 91st Cong., 2d Sess. 28–29 (1970).

Despite these expressions of legislative intent, the bridges were not put in good repair. Of the total $8,538,000 authorized by Congress for Canal work, $3,807,000 was intended for bridge repairs. By August 1976, $3,664,000 had been expended under the authorization; but none of the funds were spent on repair of the highway bridges. Instead, the United States and Illinois have conducted negotiations concerning further revisions of the 1960 Agreement. A new superseding draft has circulated between the Corps and the Illinois State Department of Conservation. A new Schedule A as of October 23, 1973, included work on the highway bridges consisting of replacement of a majority of the bridges with new bridges or embankments and culverts, rehabilitation of most of the others, and outright removal of a remaining few. A new Schedule B as of that date divided this work among the first, fifth, and eleventh positions of priority. As of May 14, 1974, no revision of the 1960 Agreement had been executed.

In part, the Corps and Illinois have been unable to reach an agreement because of rising costs. Colonel Walter H. Johnson reported to his superiors in 1974 that

> "[i]t is difficult at this time to arrive at an accurate estimate of the work to be accomplished in Schedule 'A'. In 1969, it was $6,528,000, but due to rising costs, it no longer is considered current. It is not known which bridges will be replaced with culverts and fill. While it is not as desirable for the recreational use of the Canal, it is now being considered as being more economical and an attempt to accomplish as much work as possible within the funds available." [28]

The cost of replacing and rehabilitating the bridges, using 1975 construction costs, was estimated by Corps engineer Samuel Doak as $5,000,000. Accordingly, the Corps, the State Department of Conservation, and representatives of the counties, reached an understanding in 1974 that all the bridges scheduled in the draft agreement for replacement or rehabilitation were to be replaced with corrugated metal culverts, except for four bridges to be designated state park bridges, and one to be rehabilitated for foot traffic only. [29]

Over the past twenty-odd years, the counties and townships have expressed to United States and Illinois officials their growing concern about the deteriorating and hazardous condition of the bridges and the prospect of their having to assume future and remedial responsibility for them, a possibility that would entail replacement as well as maintenance. They have insisted that without regard to the type of replacement structure, the bridges will require maintenance as long as the canal remains in place, and that such replacement or maintenance would be an unreasonable financial hardship on the counties and townships. They have also insisted

> "that since the townships and counties were not required to maintain bridges presently located in other State parks that they should not be required to do so, if and when the I. & M. Canal becomes a State park." [30]

The Commissioners of Highways and the counties instituted this litigation in July 1974 in part because they could not obtain from defendants a clear commitment that the Corps would promptly replace the bridges with corrugated metal culverts, and that the state would assume responsibility

---

28. Corps document dated May 16, 1974, from Col. Walter H. Johnson to HDQA, Washington, D. C., item 6.

29. Corps Disposition Form, dated May 15, 1974, from Samuel S. Doak, Chief, Design Branch, to District File re "I & M Canal, Bridge Replacement and Rehabilitation Program" at item 4.a.

30. Memorandum dated September 1, 1960, from William M. Dutelle, State Department of Public Works and Buildings, Division of Highways, to E. A. Rosenstone, Director of the Division of Highways (report of I & M Commission meeting of August 17, 1960). The State has admitted that the counties and townships are the only local governmental entities in Illinois which are required to maintain bridges located in a state park. *Supra* 1.

for the completed corrugated metal structures.[31]

## II. The Procedural Posture of this Case

### A. Record before the Court

Plaintiffs prosecute this cause by a two count amended complaint.[32] In Count I, they seek affirmation of their rights under the condemnation decrees, rights they contend are protected by the Fifth and Fourteenth Amendments to the federal Constitution. They insist they have the right to continued maintenance of the subject bridges by the United States, and to a judgment declaring that insofar as federal legislation attempts to deny them this right, such legislation is unconstitutional. In Count II, plaintiffs seek a judgment declaring that insofar as state legislation attempts to deny them rights granted them by the condemnation decrees of this court, such legislation violates the Constitution of the United States. Particularly, plaintiffs seek a judgment declaring that the state statute at issue, Ill.Rev.Stat. ch. 105, § 482d (1977), violates both the 1870 and 1970 Illinois constitutions.

The United States and the other federal defendants have filed an amended answer, cross-claim, and a third party complaint in which they name the State of Illinois a defendant and pray for a judgment declaring that by virtue of state and federal legislation, valid agreements, and a quit-claim deed, the obligations of the United States to maintain the highway bridges in question have passed to the State of Illinois. The state defendants have also answered plaintiffs' complaint, but have not responded to the cross-claim nor to the third party complaint. Fifty-two exhibits have been admitted in support of the agreed statement of facts; proposed findings of fact and conclusions of law, with supporting memoranda, have been submitted by the parties.

### B. Jurisdiction over this Dispute

▮ Plaintiffs invoke the jurisdiction of this court on the theory that the subject matter of this suit is within the purview of the federal question statute, 28 U.S.C. § 1331(a); and thus, the court can give them mandamus and declaratory judgment relief under the provisions of 28 U.S.C. §§ 1361, 2201, respectively. They seek affirmation and enforcement of decrees which this court entered in the condemnation proceedings already described. They challenge the validity of certain federal and state statutes under the Fifth and Fourteenth Amendments to the Constitution of the United States. These matters in controversy clearly "arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a). As amended in 1976, § 1331(a) no longer requires a jurisdictional amount of more than $10,000 "in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity."[33] Insofar as plaintiffs seek to enforce the bridge maintenance obligations under the condemnation decrees, they want "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. And since plaintiffs pursue rights granted by a number of condemnation decrees entered under federal law and the federal Constitution, and the controversy is thus otherwise within this court's jurisdiction, the statutory requirements for a declaration of "rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," 28 U.S.C. § 2201, are satisfied. Finally, since the state law issues, that is, the validity under Illinois constitutional provisions of the state statute imposing maintenance obligations for the bridges on the counties and townships and

---

**31.** Corps Disposition Form, *supra* note 29, at item 5.

**32.** A third count, containing a claim for enforcement of the draft agreements between the United States and the State regarding the

bridges, has not been pursued. Therefore, the court concludes it has been withdrawn.

**33.** Act of October 21, 1976, Pub.L. 94–574, § 2, 90 Stat. 2721.

the federal law issues are derived from a "common nucleus of operative fact," this court has the power to hear the state claims under the doctrine of pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Earlier in these proceedings, Judge Decker of this court, in an exhaustive memorandum opinion, sustained plaintiffs' jurisdictional contentions; and since then, the federal defendants have not questioned this court's jurisdiction. However, the state defendants make two challenges to plaintiffs' right to sue the State of Illinois or its agencies. First, they argue that plaintiffs are mere creatures and political subdivisions of the state and therefore do not possess rights against it under the Constitution of the United States. Second, they argue that plaintiffs are barred by the Eleventh Amendment from bringing this suit against the state.

As to their first argument, the defendants are correct. It has long been settled that

> "[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator. *Trenton v. New Jersey*, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937; *Newark v. New Jersey*, 262 U.S. 192, 43 S.Ct. 539, 67 L.Ed. 943; *Worcester v. Worcester Consolidated Street Ry. Co.*, 196 U.S. 539, 25 S.Ct. 327, 49 L.Ed. 591; *Pawhuska v. Pawhuska Oil Co.*, 250 U.S. 394, 39 S.Ct. 526, 63 L.Ed. 1054; *Risty v. Chicago, R.I. & P.Ry. Co.*, 270 U.S. 378, 390, 46 S.Ct. 236, 70 L.Ed. 641; *Railroad Commission v. Los Angeles Ry. Corp.*, 280 U.S. 145, 156, 50 S.Ct. 71, 74 L.Ed. 234." *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933); *accord, Supervisors of Boone County v. Village of Rainbow Gardens*, 14 Ill.2d 504, 508, 153 N.E.2d 16 (1958).

Therefore, this court has to dismiss as much of plaintiffs' cause of action as seeks a declaration and related remedies against violations of plaintiffs' Fifth and Fourteenth Amendment rights by the State of Illinois. Rule 12(h)(3), Fed.R.Civ.P.

In support of their second argument, the state defendants contend, that (a) the Eleventh Amendment bars suits against the state by its own citizens, (b) plaintiffs seek to shift the pecuniary burden of bridge maintenance to the state treasury, and (c), where a state citizen's suit seeks to impose a liability which must be paid from public funds in the state treasury, the state is immune from a suit which is brought without its consent. The state defendants cite as authority *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) and other Supreme Court decisions cited therein.

However, the full holding and ultimate disposition ·in *Edelman v. Jordan* militate against the result the state defendants would have this court reach. In that case the plaintiff brought a class action seeking injunctive and declaratory relief against Illinois officials administering the federal-state programs designed to aid the aged, blind, and disabled. It was alleged that state officials had violated federal law, and had denied plaintiff and members of the class equal protection of the laws by wrongfully withholding retroactively awarded benefits and failing to comply with certain federal time limits. The Supreme Court reversed only the order to pay retroactive benefits, holding that this relief was barred by the Eleventh Amendment.

■ Plaintiffs in this case have not asked for a monetary award from the State; rather, they pray for a declaration that the Illinois statute at issue violates the state constitution, and for an injunction against its enforcement by the defendant state officials. Under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), such relief is not barred by the Eleventh Amendment. There the court sustained an injunction against enforcement of a Minnesota statute which allegedly deprived nine railroads, of which plaintiffs were shareholders, of property without due process of law. Mr. Justice Peckham, writing for the Court, said:

"If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subject in his person to the consequences of his individual conduct." *Id.* at 159–160, 28 S.Ct. at 454. *Ex parte Young,* of course, does not apply to plaintiffs' claim against state officials and agencies under the state constitution. Standing to assert state constitutional violations is to be determined from state practice. *Williams v. Mayor and City Council of Baltimore,* 289 U.S. at 47–48, 53 S.Ct. 431. The Supreme Court of Illinois has adopted a doctrine analogous to that expressed in *Ex parte Young;* it has held that a state official

"[is stripped] of his official status when he is enforcing an unconstitutional statute . . . ; his conduct is not then regarded as the conduct of the State, nor is the action against him considered an action against the State. *People ex rel. First National Bank v. Kingery,* 369 Ill. 289, 16 N.E.2d 761 [1938]." *Moline Tool Co. v. Department of Revenue,* 410 Ill. 35, 37, 101 N.E.2d 71, 72 (1951); *accord, County of Cook v. Ogilvie,* 50 Ill.2d 379, 383, 280 N.E.2d 224, 226 (1972); *Noorman v. Department of Public Works,* 366 Ill. 216, 221–22, 8 N.E.2d 637, 639 (1937); *Joos v. Illinois National Guard,* 257 Ill. 138, 143–44, 100 N.E. 505, 506–07 (1912).

In *County of Cook v. Ogilvie,* 50 Ill.2d 379, 280 N.E.2d 224, the court did not even discuss the municipal corporation's standing to assert state constitutional claims against state officials. But in *Cro-*

*nin v. Lindberg,* 66 Ill.2d 47, 4 Ill.Dec. 424, 360 N.E.2d 360 (1976), defendants argued that because of its status as a political subdivision of the state, the Chicago Board of Education lacked standing to be a plaintiff and assert alleged constitutional violations. The argument was rejected; and it was held that the Board, although otherwise subject to the legislative will, could assert a denial of equal protection. 66 Ill.2d at 56, 4 Ill.Dec. at 433, 360 N.E.2d at 363–64. The Illinois Supreme Court has also permitted political subdivisions to challenge state action under the special legislation provision of the 1870 constitution.[34] *See West Chicago Park Commissioners v. City of Chicago,* 216 Ill. 54, 74 N.E. 771 (1905). Indeed, a holding to the contrary would have seriously undermined the ban against special legislation contained in the 1870 constitution and in its successor, the constitution adopted in 1970.[35] The very localities which might be most aggrieved by such constitutional violations would be denied any direct judicial remedy. Therefore, contrary to the state defendants' argument, plaintiffs in the present case have standing to assert their state constitutional claims against the defendant state officials. However, this jurisdiction does not extend to the defendant state agencies. The Illinois analogue to the doctrine of *Ex parte Young* maintains the protection of sovereign immunity for state agencies. *Noorman v. Department of Public Works,* 366 Ill. 216, 8 N.E.2d 637; *Joos v. Illinois National Guard,* 257 Ill. 138, 100 N.E. 505; *cf. Moline Tool Co. v. Department of Revenue,* 410 Ill. 35, 101 N.E.2d 71. Therefore the state agencies must also be dismissed pursuant to Rule 12(h)(3), Fed.R.Civ.P.

**34.** Ill.Const. of 1870, art. 4, § 22, provides, in pertinent part:

"The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: For—

" . . .

"Regulating county and township affairs;

" . . .

"In all other cases where a general law can be made applicable, no special law shall be enacted."

**35.** Ill.Const. of 1970, art. 4, § 13, provides in pertinent part:

"The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination."

■ Finally, it is contended that the doctrine of sovereign immunity applies to this case because plaintiffs' suit seeks to impose a liability which must be paid from the state treasury. But in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, the Supreme Court drew a distinction between prospective decrees which might have fiscal consequences and the retroactive award there barred by the Eleventh Amendment:

> "State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young* . . . ." 415 U.S. at 668, 94 S.Ct. at 1358.

The effect of the decrees on the state's treasury, if plaintiffs are granted the declaratory judgment they seek, would be ancillary in nature and therefore permissible. Accordingly, this court rejects the state defendants' second argument and holds that the Eleventh Amendment does not bar its jurisdiction over plaintiffs' claims against defendant state officials under the state constitution.

■ In their answer to the amended complaint, the state defendants pleaded the affirmative defense that this court should abstain from asserting jurisdiction over the state constitutional issues. These defendants have not pursued the defense nor briefed the issue for the court. This failure is not fatal, however. Abstention is not so much an affirmative defense as a doctrine which allows a federal court to decline immediate exercise of the jurisdiction it otherwise possesses—by stay or dismissal—pending actual or prospective state judicial or administrative resolution of questions of state law. *E. g., England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); *Burford v. Sun Oil*

*Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *see* C. Wright, Federal Courts 218–29 (3d ed. 1976). For the following reasons, the court finds abstention inappropriate in this case. First, there is no possibility of avoiding a decision of the federal constitutional question by disposition of the case on the basis of state law, in contrast with the situation in *Railroad Commission of Texas v. Pullman.* A holding that the Illinois statute imposing on plaintiffs the obligation to maintain the highway bridges over the canal is constitutional does not resolve the question whether plaintiffs can look to the United States to perform this obligation for them under the condemnation decrees. Second, interpretation of the relevant state constitutional provisions is settled enough that this court can resolve the state law issues without interfering with the administration by the state of its own affairs. *Compare Louisiana Power & Light Co. v. City of Thibodaux with County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959), (handed down the same day). Third, abstention would bifurcate a single case and result in piecemeal litigation. *Baggett v. Bullitt,* 377 U.S. 360, 378–79, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). This of course runs counter to the principles of pendent jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. at 726–27, 86 S.Ct. 1130. Finally, under the circumstances of this case, no prejudice to the state defendants result from this court's exercise of its jurisdiction over the state law issues.

### III. The Issues Presented

From this record, generated by the arguments and contentions of the parties, four issues are presented.

1. Whether plaintiffs as successors to the beneficiaries under the condemnation decrees entered by this court have rights that entitle them to compel performance by the United States of obligations imposed by those decrees.

2. Whether Congress in enacting certain legislation dealing with the Illinois-Mississippi Canal has unconstitutionally deprived plaintiffs of their rights to enforce the condemnation decrees.

3. Whether by conveying the canal lands to Illinois in August 1970, the United States was relieved of the obligation to maintain the highway bridges over the Illinois-Mississippi Canal.

4. Whether the State of Illinois in imposing on plaintiffs the obligation to maintain the highway bridges now in a state park has violated the equal protection guarantees which plaintiffs had and now have under the Illinois constitutions of 1870 and 1970.

### IV. Resolution of the Issues

A. Rights of the Plaintiffs and Their Entitlement to Relief Against the United States

Considered in the context of eminent domain law, the obligation to build and maintain bridges which the condemnation decrees imposed on the United States is anomalous.

"The power to take private property for public uses, generally termed the right of eminent domain, belongs to every independent government. It is an incident of sovereignty, and as said in *Boom v. Patterson,* 98 U.S. (8 Otto) 403, 25 L.Ed. 206, requires no constitutional recognition. The provision found in the Fifth Amendment to the federal Constitution, and in the Constitutions of the several States, for just compensation for the property taken, is merely a limitation upon the use of the power." *United States v. Jones,* 109 U.S. 513, 518, 3 S.Ct. 436, 350, 27 L.Ed. 1015 (1883).

**36.** The leading case of *Vanhorne's Lessee v. Dorrance,* 2 Dall. 304, 1 L.Ed. 391 (Pa. Cir. 1795), declared unconstitutional a Pennsylvania statute that provided for awards of other lands in compensation to the owners of certain lands taken. In so finding, Mr. Justice Patterson stated:

"By the act [under review], the equivalent is to be in land. No just compensation can be made, except in money. Money is the com-

Accordingly, on the petition of a condemnor judicial proceedings are conducted to assess the damages caused to an owner's rights or interests in property by the condemnation. Court proceedings essentially set the price for an involuntary transaction between the condemnor and the condemnee. Depending on the law of the jurisdiction, a court may or may not decree actual payment of the damages caused and passage of title to the rights or interests that are taken. 27 Am. Jur.2d *Eminent Domain* § 443 (1966). But whatever the procedure, the compensation is almost always monetary. Indeed, nearly every court that has faced the question has determined that this must be so. 3 P. Nichols, Eminent Domain § 8.2 (rev. 3d ed. 1977).[36]

However, this need not always be. For example, the United States Supreme Court recently said,

"[n]o decision of this Court holds that compensation other than money is an inadequate form of compensation under eminent domain statutes. Statements can be found in opinions that the compensation 'must be a full and perfect equivalent for the property taken,' *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 326, 13 S.Ct. 622, 37 L.Ed. 463 (1893); must reimburse 'the full and perfect equivalent in money of the property taken,' *United States v. Miller,* 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336 (1943); and must be the 'full monetary equivalent of the property taken,' *United States v. Reynolds,* 397 U.S. 14, 16, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970); see also *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 473, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973). Yet, in none of these cases was compensation in a form

mon standard, by comparison with which the value of anything may be ascertained. . . Compensation is a recompense in value, a *quid pro quo,* and must be in money. True it is, that land or anything else may be a compensation, but then it must be at the election of the party; it cannot be forced upon him. His consent will legalise the act, and make it valid; nothing short of it will have the effect." *Id.* at 315.

other than cash an issue. The clear implication of other decisions is that consideration other than cash—for example, any special benefits to a property owner's remaining properties—may be counted in the determination of just compensation." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 150–51, 95 S.Ct. 335, 362, 42 L.Ed.2d 320 (1974).

This principle had been applied by the court in an earlier case, *Kennedy v. Indianapolis,* 103 U.S. 599, 26 L.Ed. 550 (1880). There a claim to land depended on whether title had originally passed by virtue of condemnation for the construction of a canal that had not been completed as planned. The Court determined that under Indiana law "title does not pass from the owner without his consent until just compensation has been made to him." *Id.* at 604. Appropriate proceedings had determined that the benefits one condemnee would receive from the canal was just compensation for the property taken. No claim for compensation was made by the other condemnees. The Court concluded:

> In this way these parties signified under the law their willingness to take as their compensation the benefits which would result to them respectively from the construction of the canal. The appropriation was for public use by means of a canal, and the owners were to be paid their compensation for the land taken by the construction of a canal thereon. It would seem to follow that if the canal was constructed the compensation which the Constitution guaranteed the owner would be made; otherwise not. If the canal was in law built, therefore, the title passed to the State; if not, it remained in the owner. The failure to claim damages within the [statutory limit of] two years was no more than a waiver of all compensation except such as grew out of the benefits resulting from the construction of the work for which the appropriation was made." *Id.* at 604.

▮ In this case, the condemnation decrees which imposed bridge maintenance obligations on the United States, similarly constituted part of the just compensation awarded the Commissioners of Highways, and have unique force because of Illinois law. Eminent domain is a power possessed by the United States and vested in Congress. *2,953.15 Acres of Land v. United States,* 350 F.2d 356, 359 (5th Cir. 1965); *see Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585–86, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Exercise of the power must be conferred by congressional enactment, either in express words or by necessary implication. *Hooe v. United States,* 218 U.S. 322, 335–36, 31 S.Ct. 85, 54 L.Ed. 1055 (1910). When this power is delegated, it can be exercised only in the manner authorized. *Tuscarora Nation of Indians v. Power Authority,* 257 F.2d 885, 894 (2d Cir.), *cert. denied,* 358 U.S. 841, 79 S.Ct. 66, 3 L.Ed.2d 76 (1958), *rev'd on other grounds,* 362 U.S. 608, 80 S.Ct. 960, 4 L.Ed.2d 1009 (1960). In both the 1890 and 1896 River and Harbor Acts, Congress directed that "in such proceedings [for condemnation the district] court shall be governed by the laws of the State of Illinois so far as the same may be applicable to the subject of condemning private property for public use . . . ." 26 Stat. at 449; 29 Stat. at 228.

▮ It is well established that public highways owned or maintained by a municipal corporation, when taken by the United States for public use, constitute private property within the protection of the Fifth Amendment. *United States v. Wayne County, Kentucky,* 252 U.S. 574, 40 S.Ct. 394, 64 L.Ed. 723 (1920), *aff'd per curiam* 53 Ct.Cl. 417 (1918); *County of Sarpy, Nebraska v. United States,* 386 F.2d 453, 457, 181 Ct.Cl. 666 (1967). Where the municipality does not own the highway, but merely holds it for public use, its property interest consists of the right to be free of the obligation to construct and maintain a substitute way. *Jefferson County, etc. v. Tennessee Valley Authority,* 146 F.2d 564 (6th Cir. 1945); *Town of Bedford v. United States,* 23 F.2d 453 (1st Cir. 1927). In many cases, just compensation has been found to consist of the condemnor providing necessary substitute highway facilities, *e. g., Jefferson*

*County v. Tennessee Valley Authority;* paying the cost of such substitute facilities, *e. g., County of Sarpy, Nebraska v. United States;* or paying the difference between the municipality's increased maintenance costs as a result of the taking and the municipality's costs of performing such maintenance as it would ordinarily be required to perform, *e. g., United States v. Wheeler Township,* 66 F.2d 977 (8th Cir. 1933).

The effect of a condemnor's promissory statements or stipulations in Illinois is at the very least unusual, if not unique. In a majority of other American jurisdictions, it is the rule that

"[w]hatever rights are sought to be appropriated in eminent domain must be taken absolutely and unconditionally. A condemnor cannot avail itself of what may aptly be termed a 'conditional' condemnation, but as a general thing must take absolutely whatever rights it seeks to appropriate, paying in full therefor, regardless of future intentions or statements regarding them. Thus, it is agreed that an unaccepted promise, promissory statement, or stipulation, or declaration of future intentions by a condemnor as to what will be done or not done with respect to the property condemned, or to that left untaken and to the landowner in relation thereto, cannot affect either the character or extent of the condemnor's rights acquired or the amount of damages it must pay as just compensation." 26 Am.Jur.2d *Eminent Domain* § 154 (1966).

[13] But a long line of Illinois cases have held that stipulations as to the future use of property, construction, rights, and the like, are binding and to be considered in assessing condemnation damages. *E. g., East Peoria Sanitary District v. Toledo, P. & W. R. R. Co.,* 353 Ill. 296, 187 N.E. 512 (1933); *see Annot.,* 7 A.L.R.2d at 395–98. For example, in *Jacksonville and S. R. Co. v. Kidder,* 21 Ill. 131 (1859), a condemnation decree was reversed because the trial court did not admit plans and estimates which showed the condemnor undertook construction of two roadways in the place of exist-

ing access between parts of the condemnee's farm. The court concluded:

"We do not hesitate to say that the company would be bound to construct the road substantially according to the plans thus put in evidence, and if its own or the public interest required a deviation from such plan to the injury of the owner of the land, he could recover damages in an action on the case, or on the implied understanding that the road should be constructed conformably to such plan." 21 Ill. at 135.

Later in the opinion the court said:

"Should the company change the plan thus offered in evidence and preserved in the records of the court, and undertake to construct the road on a plan more injurious to the land, a court of equity could restrain them till the additional damages were assessed and paid." *Id.* at 136.

■ In *East Peoria Sanitary District v. Toledo, P. & W. R. R. Co.,* 353 Ill. 296, 187 N.E. 512, petitioner proposed to take land to relocate and construct drainage ditches. It offered in evidence the plans and resolutions of its board of trustees which authorized its attorneys to stipulate that if the lands in question were taken, petitioner and its successors would provide or build and maintain an open ditch, a wooden pine trestle bridge, and a reinforced concrete headwall for the condemnee's benefit. 353 Ill. at 302–03, 187 N.E. at 515. One resolution stipulated that the condemnor's obligations were to be covenants running perpetually with the land. In holding that the resolutions were competent evidence and properly admitted, the court said:

"The general rule has been announced in many cases that the filing in court of a stipulation by the petitioner in a condemnation proceeding, agreeing to do certain things which would reduce the injury to property not taken, subjects the estate acquired by the condemnation judgment to a condition of perpetual and binding character, which cannot be evaded or denied." 353 Ill. at 305, 187 N.E. at 516.

Further, the court said, "There can be no doubt that the [condemnee] could enforce

the obligations undertaken . . . ." 353 Ill. at 307, 187 N.E. at 517. Therefore, these cases, the enabling legislation, and the records of this court show that the condemnation decrees which imposed on the United States the obligations to build and maintain highway bridges over the Illinois-Mississippi Canal created "a condition of a perpetual and binding character, which cannot be evaded or denied." 353 Ill. at 305, 187 N.E. at 516.

▮ Whether the obligations were covenants running with the land is a question that is not easily answered. The parties have not cited, nor has this court's research located, any Illinois case in which this question was considered in the context of a proceeding to enforce a condemnation decree rather than one in which the relief sought was the taking of land. However, it is clear that the current Illinois rule for determining whether a covenant runs with the land originated with *Purvis v. Shuman,* 273 Ill. 286, 294–95, 112 N.E. 679, 682 (1916):

> "The test whether a covenant runs with the land or is merely personal is whether the covenant concerns the thing granted and the occupation or enjoyment of it, or is a collateral and personal covenant not immediately concerning the thing granted. If the covenant concerns the land and the enjoyment of it, its benefit or obligation passes with the ownership, but to have that effect the covenant must respect the thing granted or demised, and the act to be done or permitted must concern the land or estate conveyed."

The court rejected the rule of *Spencer's Case,* 77 Eng.Rep. 72 (K.B. 1583), one that distinguished between a covenant which relates to a thing in esse and one which relates to a thing not in esse, and held that the latter can run with the land and bind assigns even though they are not expressly named. 273 Ill. at 298, 112 N.E. at 683. The holding in *Purvis* also implies that the intent of the parties to create a covenant running with the land need not be expressed; it can be inferred from the nature of the covenant, depending on the circum-

stances. *Cf. Brockmeyer v. Sanitary District of Chicago,* 118 Ill.App. 49, 58–59 (1st Dist. 1905). At the same time, not even an express agreement that a covenant run with the land can make it so if the undertaking is of a nature which the law does not permit to be so attached. *Gibson v. Holden,* 115 Ill. 199, 208, 3 N.E. 282 (1885); *Keogh v. Peck,* 259 Ill.App. 503, 512 (1st Dist. 1931).

▮ An obligation to maintain bridges, as in this case, is of the kind that can run with the land. Under the test of *Purvis v. Shuman,* such an obligation concerns "occupation or enjoyment" of the lands granted to the United States by the condemnation decrees. Since the obligation requires maintenance of bridges on the lands acquired by condemnation, it "respect[s] the thing granted," and the "act to be done" is directly upon the lands conveyed. Illinois law permits a covenant imposing a burden to run with the land as readily as one conferring a benefit. *Dorsey v. St. Louis, A. & T. H. R. R. Co.,* 58 Ill. 65, 67–68 (1871). Illinois cases abound with examples of burdens that run with the land; they include agreements: to erect and maintain fences, cattle guards, crossings, gate and depot along a railroad; to erect and continuously maintain a levee and ditch with outlets; to restore and continue use of switch connections interrupted by construction of railway tracks. *Sanitary District of Chicago v. Martin,* 129 Ill.App. 308 (1st Dist. 1906), *aff'd,* 227 Ill. 260, 81 N.E. 417 (1907); *Brockmeyer v. Sanitary District of Chicago,* 118 Ill.App. 49; *Pittsburgh Ft. W. & C. R. R. Co. v. Reno,* 22 Ill.App. 470 (1st Dist.), *aff'd,* 123 Ill. 273, 14 N.E. 195 (1887); *cf., Sterling Hydraulic Co. v. Williams,* 66 Ill. 393 (1872). And to construe the obligation like the one in this case as a covenant running with the land is consistent with the common law duty of a private canal owner, whether as original builder or subsequent transferee, to construct and maintain bridges where the canal cuts through existing public highways "as long as the necessity for the bridge exists . . . ." *City of Indianapolis v. Indianapolis Water Co.,* 185 Ind. 277, 295, 113 N.E. 369, 374 (1916):

"There can be no doubt that at common law any person who, although acting under lawful authority, interferes with and cuts through an existing public highway and thus renders a bridge necessary, must build such a bridge in order to enable the public to exercise their right of passage, and must maintain and repair such bridge, with its approaches, until he abandons his operations and restores the highway to its original condition. Many of the following authorities which recognize this rule expressly apply the same to the construction of bridges over canals. [Citations omitted.]

. . . . . .

"Further authority for the rule that this obligation attaches, even though the statute authorizing the construction of the new work is silent on the subject, and that it is a continuing duty in the nature of a covenant running with land, which will ordinarily pass to the successive owners of the property, may be found in the following cases: *Phoenixville v. Phoenix Iron Co.* (1863), 45 Pa.St. 135, 140; *Hertfordshire Council v. New River Co., supra,* at p. 518; *City of Chicago v. Pittsburgh, etc., R. Co.* (1909), 146 Ill.App. 403, 414; *Pennsylvania R. Co. v. Duquesne Borough* (1863), 46 Pa.St. 223, 228; *President and Trustees, etc. v. Mann* (1883), 59 Wis.69, 17 N.W. 972; *Dyer County v. Railroad* (1889), 87 Tenn. 712, 723, 11 S.W. 943." 185 Ind. at 285–87, 113 N.E. at 371–72.

The remaining point to be discussed is the fact that the obligations in this case arise from a court decree, rather than from express agreement between the parties. This, however, is not determinative; such an agreement can be implied. The records of this court show that the original Commissioners of Highways did not contest the condemnation proceedings. Indeed, the documents in *Maxson II* reveal that the Commissioners of Highways of the Towns of Coloma, Montmorency, Hume, Tampico, Fairfield, and Gold did not even appear in *Maxson I*. They neither appealed nor instituted any subsequent proceeding from the condemnation decrees, other than a cross-claim in *Maxon II* that contested the specifications of the bridges rather than the award of just compensation that was limited to one dollar, and the construction and maintenance of bridges. Therefore, these Commissioners stood in the position of condemnees who

"[i]n this way . . . signified under the law their willingness to take as their compensation the benefits which would result to them respectively from the construction of the canal." *Kennedy v. Indianapolis,* 103 U.S. 599, 604, 26 L.Ed. 550 (1880).

For these reasons, this court holds, in accord with pronouncements of the Supreme Court of Illinois, that the bridge maintenance obligations incorporated in the condemnation decrees are covenants which run with the land. *Lyon v. Hammond & B. I. R. R. Co.,* 167 Ill. 527, 47 N.E. 775 (1897). And this being the case, plaintiffs as successors to those for whose benefit the United States undertook to build and maintain the bridges in question can sue to compel performance of the obligations imposed by the condemnation decrees entered by this court. *Cf. University Hills, Inc. v. Patton,* 427 F.2d 1094 (6th Cir. 1970); *see* 21 C.J.S. *Covenants* §§ 80, *et seq.* (1940); 20 Am.Jur.2d *Covenants, Conditions, Etc.* § 21 (1965).

**B. The Effect of the Legislation Enacted by Congress**

The effect of the various congressional enactments dealing with the Illinois-Mississippi Canal is hotly disputed by the parties. Plaintiffs contend that to the extent the River and Harbor Act of 1958 interferes with their rights to federal maintenance of the subject bridges, it contravenes the due process and just compensation clauses of the Fifth Amendment. They rely on many of the cases the court has already discussed.

The federal defendants argue that the 1958 Act ended all responsibility of the United States to maintain the bridges when the canal properties passed to the state under the quitclaim deed. They rely primarily on *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. 421 (18 How.), 15

L.Ed. 435 (1855) where, in an earlier decision, the court had required removal of a bridge it found was an obstruction to navigation pursuant to a federal statute. *See Pennsylvania v. Wheeling & Belmont Bridge Co.*, 54 U.S. 518 (13 How.), 14 L.Ed. 249 (1852). Congress subsequently enacted legislation declaring the particular bridge not an obstruction to navigation, and the Supreme Court upheld the statute in its second *Wheeling* decision. Federal defendants contend that this case is authority for deference to legislative revision of a judicial decision. They argue that such deference is called for where a judicial decree establishes public, as opposed to private, rights. *System Federation No. 91 v. Wright*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); *Hodges v. Snyder*, 261 U.S. 600, 43 S.Ct. 435, 67 L.Ed. 819 (1923); *Class v. Norton*, 507 F.2d 1058 (2d Cir. 1974); *Daylo v. Administrator of Veterans Affairs*, 163 U.S. App.D.C. 251, 501 F.2d 811 (1974).

Plaintiffs distinguish the decisions in *Wheeling & Belmont Bridge Co.* They argue that the later case involved exercise of congressional power under the commerce clause rather than legislative abrogation of a condemnee's Fifth Amendment rights, and point to the Supreme Court's statement

"if the remedy in this case had been an action at law, and a judgment entered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of Congress." 59 U.S. at 431.

Therefore, they contend, the obligations in question could not be abrogated by Congress because they were the counties' and townships' compensation for a taking of private property under the Fifth Amendment. *See, e. g., United States v. Wheeler Township*, 66 F.2d 977, 982 (8th Cir. 1933).

 This dispute, however, need not be resolved. It is clear that the River and Harbor Act of 1958 could not, and indeed, was not intended to, interfere with plaintiffs' rights under the condemnation decrees. In two critical provisions contained in § 110(b) of the Act, Congress mandated that (1) the $2,000,000 appropriated for repair and modification were to be expended on any canal appurtenances "except bridges and roads, which the United States has maintained or has been obligated to maintain"; and (2) after the Secretary of the Army had agreed with the State of Illinois concerning repairs, modifications, and transfer of title, "[u]pon such conveyance the United States shall have no further obligation with respect to the canal." 72 Stat. at 302. The reach of these provisions is evident both on their face and in the light of the amendments to § 110(f) which Congress adopted in 1962 and 1970.

The first phrase expressly recognizes that the United States "has been obligated to maintain . . ." the bridges. The use of the present perfect rather than the final past tense indicates that the obligations were continuing; in no way does it imply that the maintenance obligations were immediately abrogated by the statute. Moreover, the $2,000,000 was but an initial authorization, $800,000 less than the Corps had recommended.[37] Thus, the exception of bridge work from the expenditures for the canal was not intended to be final. This is borne out by subsequent authorization of the additional $800,000 in 1962 "notwithstanding the provisions of section 110(b)," 76 Stat. at 1179; and the 1970 increase to the additional authorization of "$6,528,000 to be expended for the repair, modification, and maintenance of bridges . . ." as well as other work, 84 Stat. at 1821.

The second phrase must be interpreted as a directive to the Secretary of the Army, rather than as a statement of legal fact. Section 110(b) as a whole directs the Secretary to perform enumerated duties so that the completed transfer will achieve certain results. In this context, the phrase was a direction to the Secretary to perform these duties so that as a result "[u]pon such conveyance the United States shall have no

---

37. *1970 Hearings, supra* note 11, at 177–79 (Remarks of Hon. John Kluczynski), 219 (Remarks of Gen. Richard Groves). The court can of course take judicial notice of legislative documents. Fed.R.Evid. 201(b)(2) & (c). Corps document dated April 11, 1956, *supra*, note 14.

further obligation with respect to the canal." The use of the volitional or prescriptive "shall" rather than the simple futurity of "will" bears this out.[38] Moreover, the passage of the 1970 Act on December 31st, after the state accepted the quitclaim deed, indicates a recognition by Congress that the transfer had not yet been so effected, and that there were continuing obligations on the part of the United States with respect to the canal. Consequently, the rights of the townships and counties to continued maintenance of the bridges by the United States were not abrogated nor adversely affected by the congressional enactments of 1958, 1962, and 1970. Therefore, Congress did not, in fact never intended to, deprive plaintiffs of the Fifth Amendment rights they acquired from the condemnation decrees of this court.

C. Conveyance of the Canal Lands to Illinois in August 1970 and Its Effect on the Obligations of the United States to Maintain the Bridges

 It being the fact that the obligations of the United States to maintain the Illinois-Mississippi Canal bridges were covenants that ran with the land, never having been abrogated by any Act of Congress, the question that arises is whether the quitclaim of the canal lands to Illinois in August 1970 relieved the United States of the bridge maintenance obligation created by this court when it entered the condemnation decrees. The quitclaim, absent an express limitation in the conveyance, passed those covenants to the grantee. *Morgan v. Clayton*, 61 Ill. 35, 40 (1871); *Brady v. Spurck*, 27 Ill. 478, 482 (1861); *Annot.* 44 A.L.R. 1266 (1926). There were no limita-

tions in the quitclaim deed by which the canal lands were conveyed. The deed was effective when delivered and accepted, *Gallagher v. Girote*, 23 Ill.2d 170, 174, 177 N.E.2d 103 (1961); and the intent of the parties controlled its effective date, *Clodfelter v. Van Fossan*, 394 Ill. 29, 36, 67 N.E.2d 182 (1946). Therefore, nothing to the contrary appearing, it must be concluded that title to the canal lands passed to the State of Illinois from the United States in August 1970, and with it the obligation to maintain the bridges thereafter. *Brady v. Spurck*, 27 Ill. 478; *compare Morris v. Goldthorp*, 390 Ill. 186, 60 N.E.2d 857 (1945).

It must be noticed, however, that at the time this deed became effective, in fact, for some 25 years before, the United States was in default of the obligations imposed on it by the condemnation decrees. Its agent has reported that from 1945 to 1970 the bridges in question had not been maintained. The obligations, of course, covenants that ran with the land, were implied agreements between the parties to the condemnation; they were effective and binding. *Cf. City of Chicago v. Barbian*, 80 Ill. 482 (1875). Notwithstanding these well established principles, the federal defendants contend that under the law of the subject state the obligations of the United States as a covenantor terminated on conveyance of the canal lands to Illinois. They so argue despite the fact no Illinois court has so decided. But courts of other jurisdictions faced with the same issue have reached a contrary result. For example, in *Washington N. Gas Co. v. Johnson*, 123 Pa. 576, 591–92, 16 A. 799, 801 (1889), a lessee and its assignee were held liable on a covenant under

---

**38.** Wilson Follett, Modern American Usage 373–74 (Grosset & Dunlap ed. 1970), writes:

"It is true enough that multitudes of Americans—and, for that matter, most Irishman and Scots and an increasing number of Englishmen—do not habitually make the distinction. But it is equally true that virtually all educated persons hear the distinction when it is made by others, and hear it with the intended meanings . . . .."

". . . And whatever may be the confusion in some minds between *I will* and *I shall*, there is certainly none in any minds about the

force and purport of *you shall* and *he shall*. Hence the general understanding of *shall* and *will* correctly used still offers a solid barrier to obsolescence . . . .."

On the distinction as a whole, *see* pp. 372–75. It is hardly to be doubted that the use of "shall" in the phrase in question is the result of deliberate and careful draftsmanship to define the duties of the Secretary. The court notes that it is unnecessary to take judicial notice of such usage of language. Fed.R.Evid. 201(a) and Advisory Committee Notes to subdivisions (a) and (b).

which they were obliged to drill a second oil well within a stated period. The assignee, in possession when the time for performance arrived, was held liable because of privity of estate through the assignment. The lessee was held liable because its privity of contract continued with the lessors, notwithstanding assignment of the lease. Applying this holding to the case before the court, it clearly appears that the United States was the original covenantor; the counties and townships the original covenantees. There was a continuing privity of contract between them. In this situation, courts have usually determined that the original covenantor is continually liable to the original covenantee, even after the covenantor's title passes to a third person. In *Kintner v. Harr*, 146 Mont. 461, 408 P.2d 487 (1965), it was said by the Supreme Court of Montana:

> "The rule is well established that real covenants create in the covenantor a contractual duty which cannot be escaped simply by transferring property to another. The question of continu[ing] liability of the covenantor after the assignment turns upon the express or presumed intention of the parties to the contract. In the absence of an express provision, their intention must be determined from the language of the entire contract, giving due consideration to the surrounding circumstances." 408 P.2d at 496–97.

On the other hand, some courts have held that the liability of a covenantor under a covenant ceases when he has assigned his entire estate in the burdened land. 2 Casner, American Law of Property § 9.18 at 389 (1952) and Supp. 268 (1977) and cases cited therein. However, this court's research has not uncovered any case holding that a covenantor is released from liability for breach of a covenant that occurs before a conveyance. This is understandable because such a rule would encourage avoidance of liability for breaches of covenants running with the land by the simple device of the covenantor conveying the property to a friendly third party, a result which neither Illinois nor any other jurisdiction would approve.

Accordingly, this court holds that the quitclaim deed did not relieve the United States of liability for breaches of its obligations that occurred prior to conveyance of the canal lands to the state in August 1970. This holding is mandated by elementary principles of equity. The obligations of the United States to maintain the bridges were sought by it voluntarily in condemnation proceedings it instituted in this court; the compensation granted plaintiffs' predecessors was in effect injunctive relief entered in actions at law. *Metropolitan Railroad v. District of Columbia*, 195 U.S. 322, 328, 25 S.Ct. 28, 49 L.Ed. 219 (1904). Moreover, the holding comports with the principle that in condemnation proceedings a property owner must receive a full and perfect equivalent for the property taken. *United States v. Virginia Electric Co.*, 365 U.S. 624, 633, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961); *cf. Ettor v. City of Tacoma*, 228 U.S. 148, 33 S.Ct. 428, 57 L.Ed. 773 (1913); *City of Elgin v. Eaton*, 83 Ill. 535 (1876). Therefore, aside from the question whether the United States can transfer to the State of Illinois its obligations under the decrees, plaintiffs, as successors to parties who were beneficiaries of this court's judgments, can compel the United States to perform the obligations it assumed in the condemnation proceedings. In fact, under Illinois law, plaintiffs have a vested right to compensation in the form of maintenance which would have put the bridges in good repair as of the time the canal lands were quitclaimed to the State of Illinois. *Cf. Barry v. Guild*, 28 Ill.App. 39, *aff'd*, 126 Ill. 439, 18 N.E. 759 (1888); *see* 20 Am.Jur.2d *Covenants, Conditions, Etc.* § 21 (1965).

D. Validity under the State Constitutions of the Illinois Statute that Imposed on Plaintiffs the Obligation of Maintaining the Bridges after August 1970

As shown by the history of the dispute between the parties, Illinois accepted conveyance of the canal lands from the United States and by legislative enactment requires plaintiffs to maintain some of the

Illinois-Mississippi Canal bridges. Plaintiffs contend that the state statute which after August 1970 imposed on them the duty to maintain the bridges now located in a state park violates the special legislation provisions of the 1870 and 1970 Illinois constitutions and contravenes the state equal protection clause.[39] They point to the fact, not refuted by defendants, that the counties and townships traversed by the canal are today the only local governmental entities in Illinois which are required to maintain bridges located in a state park. Additionally, they argue that Illinois statutes require bridges in state parks to be maintained by the Department of Conservation or, by agreement, the Department of Transportation. In support of this argument, plaintiffs rely on the provisions of Ill.Rev.Stat., ch. 105, § 468(3) and ch. 121, §§ 1–103, 4–201.5 (1975). Therefore, plaintiffs insist that the statute in question, Ill.Rev.Stat. ch. 105, § 482d (1955), is discriminatory and thus unconstitutional. These arguments and the contentions of the parties, require a discussion of the statutes and the provisions of two Illinois constitutions: one adopted in 1870, in force when § 482d was enacted; and the 1970 constitution, now in force and relevant to plaintiff's claim of constitutional deprivation.

To begin with, a law enacted under one constitution and brought into question after another is adopted must be examined in the light of both. Generally, it is said that the adoption of a new constitution does not validate all statutes enacted under an earlier one. *People ex rel. Hanrahan v. Caliendo,* 50 Ill.2d 72, 76, 277 N.E.2d 319 (1971). In this case, the 1970 Constitution did not change the purpose of the constitutional ban against special legislation contained in the 1870 Illinois constitution, a ban intended "to prevent the enlargement of the rights of one or more persons and the impairment of, or discrimination against, the

rights of others. . . ." *Gaca v. City of Chicago,* 411 Ill. 146, 149, 103 N.E.2d 617 (1952). Moreover, it has been established that under the constitution of 1970, the terms "local", "special", and "general" have the same meaning that had been given them under the one adopted by the people of Illinois in 1870. *Bridgewater v. Hotz,* 51 Ill.2d 103, 109, 281 N.E.2d 317 (1972). A local law in a constitutional sense is an act which relates only to a portion of the territory of the state. Special laws are those enacted for individual cases and more appropriately applied to the grant of some special right, privilege or immunity, or to the imposition of some particular burden on some portion of the people of the state but, less than all. *Hunt v. County of Cook,* 398 Ill. 412, 418, 76 N.E.2d 48 (1947). However, in spite of these many similarities, the special legislation provisions in the 1870 and 1970 Illinois constitutions differ in two important respects.

First, the earlier constitution contained a list of *per se* categories in which special legislation was prohibited, followed by a catch-all clause. *See Hunt v. County of Cook,* 398 Ill. at 418–19, 76 N.E.2d 48. In contrast, the 1970 constitution does not contain such a list, but simply extends "when a general law is or can be made applicable" to all special or local laws enacted after the effective date of the 1970 constitution. *Youhas v. Ice,* 56 Ill.2d 497, 500, 309 N.E.2d 6 (1974); *Bridgewater v. Hotz,* 51 Ill.2d at 109–12, 281 N.E.2d 317; *People ex rel. County of DuPage v. Smith,* 21 Ill.2d 572, 577–78, 173 N.E.2d 485 (1961).

Second, the 1970 constitution provides that "[w]hether a general law is or can be made applicable shall be a matter for judicial determination." Under the earlier constitution, obviously because of the absence of this provision, great deference was paid to the judgment of the state legislature as to whether "a general law [is or] can

---

**39.** The Corps and the State have at various times contemplated replacing some or all of the bridges with earth fill and paved highway surfaces. In such event the canal and bridges would cease to exist at those points and there would be no further necessity for maintenance of those bridges. The required existence of a bridge is an implied condition limiting any obligation to maintain it. The court does not, however, intimate any opinion as to whether the presence of a culvert or pipes for water flow is consistent with the non-existence of a bridge.

be made applicable." In *Bridgewater v. Hotz*, 51 Ill.2d at 110, 281 N.E.2d at 321, the Illinois Supreme Court held that the new constitution specifically rejects the former rule and enlarges the scope of judicial review of special legislation. Thus, it can be seen that now the state equal protection clause, Ill.Const. of 1970 art. I, sec. 2, applies substantially the same standard as the catch-all provision of both constitutions. *Mier v. Staley*, 28 Ill.App.3d 373, 380–81, 329 N.E.2d 1 (4th Dist. 1975). And to be valid under the state equal protection clause "a statutory classification must be based on a real and substantial difference having a rational relation to the subject of the particular legislation." *Schiller Park Colonial Inn v. Berz*, 63 Ill.2d 499, 511, 349 N.E.2d 61, 67 (1976). This holding is in accord with the standard used in applying the federal equal protection clause. *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 172, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). Therefore, it can be concluded that the prohibitions in the Illinois constitutions against special legislation are triggered by discriminatory treatment of citizens or entities of the state otherwise similarly situated.

 This being so, it is clear from the stipulated facts that plaintiffs have failed to prove that enactment of § 482d subjects them to discriminatory treatment, in violation of constitutional protection. It has long been the law and policy in Illinois to require that roads and bridges crossing them be maintained by a county, town or road district. *People ex rel. Hoes v. Canal Trustees*, 14 Ill. 402 (1853); Illinois Highway Code, Ill.Rev.Stat. ch. 121 (1975).[40] Of course, it is true that no other local governmental entity is required to maintain a bridge located in an Illinois state park. But this does not complete the syllogism. In order to show unconstitutional discrimination, plaintiffs must establish that there is at least one other county, town or road district that by law in Illinois maintains a

road but is not required to maintain a bridge crossing it. Otherwise, § 482d of the statute in question merely imposes on plaintiffs a duty to maintain bridges as is required of all other counties and townships in the state. Plaintiffs have shown no more than that although the bridges § 482d requires them to maintain are in a state park, they are under the same duty as all other counties and other township commissioners of highways. For these reasons, the court concludes that § 482d, though local in its application, merely particularizes other general state legislation. The section may be superfluous, but in enacting it and imposing on the plaintiffs the obligation to maintain the highway bridges now in the state park, the State of Illinois has not violated the equal protection guarantees which plaintiffs had and now have under the Illinois constitutions of 1870 and 1970. *Cf. People ex rel. County of Du Page v. Smith*, 21 Ill.2d at 578–79, 173 N.E.2d 485.

## V. The Judgment to be Entered

For the reasons that underlie this court's resolution of the issues, plaintiffs are entitled to a judgment declaring that they are successors to the beneficiaries of certain condemnation decrees of this court which imposed on the United States obligations to construct and maintain bridges over the Illinois-Mississippi Canal; that as such successor beneficiaries, plaintiffs can sue to compel performance of those obligations; and that the judgment in their favor must order the United States to put all the Illinois-Mississippi Canal bridges in as good repair and maintenance as they should have been when the canal lands were conveyed to Illinois in August 1970. And since the condition of the bridges in August 1970 was the fault of the United States acting through its agents, all current costs of making the necessary repairs will be borne by the federal government.

More particularly, the declaratory judgment that is entered by this court will rec-

---

40. Among the provisions of the Highway Code cited by the state defendants are the following: Ill.Rev.Stat. ch. 121, §§ 1–103, 2–103, 5–401, 5–501, 5–506, 6–101, 6–102, 6–103, 6–201, 6–201.7, 6–201.8, 6–402, 6–404, and 6–407 (1977).

ognize the fact that while the United States was under mandatory obligations to maintain the bridges in question, obligations imposed by provisions in decrees that had the force of injunctive relief entered in actions at law, the canal lands could be conveyed to Illinois burdened with covenants that ran with the land. As to the State of Illinois, the declaratory judgment will provide that the state can pass a law, notwithstanding Illinois constitutional provisions, imposing on plaintiffs the obligations of maintaining the subject bridges after conveyance of the canal lands.

Finally, the declaratory judgment will make clear that plaintiffs can sue the individual defendants who are state officials; but because of Eleventh Amendment proscriptions, they cannot sue the State of Illinois. Accordingly, an appropriate declaratory judgment conforming to the views expressed in this Memorandum, and consistent with the pleadings including the crossclaim and third party complaint, may be presented for approval and entry.

So ordered.