(No. 48867.—)

JOSEPH M. CRONIN, State Superintendent of Education, *et al.,* Appellants, v. GEORGE W. LINDBERG, Comptroller, Appellant.—(The Board of Education of the City of Chicago *et al.,* Appellees.)

*Opinion filed Dec. 3, 1976.—Rehearing denied Jan. 28, 1977.*

48

Winston & Strawn, and Julia Quinn Dempsey, and David A. Thompson, all of Chicago (Calvin Sawyier and Christine G. Cooper, of counsel), for appellant Joseph M. Cronin.

J. Calvin Bostian, Robert M. Rogers, and Stanley N. Wasser, of Springfield (Wayne R. Andersen, Donald L. Metzger, and Burditt and Calkins, of Chicago, of counsel), for appellant George W. Lindberg.

Michael J. Murray, of Chicago (Richard E. Girard and Daniel J. Lynch, of counsel), for appellees.

Drach, Terrell and Deffenbaugh, of Springfield, for *amicus curiae* Illinois Education Association *et al.*

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

The School Code of Illinois (Ill. Rev. Stat. 1975, ch. 122, par. 1—1 *et seq.*) requires that school boards prepare annual calendars for the school term providing "a minimum term of at least 185 days to insure 176 days of actual pupil attendance" (Ill. Rev. Stat. 1975, ch. 122, par. 10—19) computed as specified in other sections of the Code. Section 18—12 of the Code provides for a reduction in the amount of State aid to any district failing to comply with this requirement. As a result of a teacher's strike in the Chicago public schools and a subsequent shortage of funds available to the Chicago Board of Education, the city of Chicago public schools operated for only 162 days of actual pupil attendance during the 1975-76 school year. This was, of course, 14 days short of the statutorily required minimum. As a result it was determined that the amount of State aid to those schools should be reduced by $53.26 million, to be deducted from State aid payments over the ensuing 3-year period. State Superintendent of Education Joseph M. Cronin (Superintendent) submitted vouchers for State aid payments to Chicago schools computed on this basis to State Comptroller George W.

Lindberg, who refused to honor them on the ground that section 18—12 required deduction of the entire amount within a 1-year period. It is from this factual setting that this litigation has arisen. There is also pending in the Sangamon County circuit court a *mandamus* action against Superintendent Cronin by the Illinois Education Association and a taxpayer who have filed here an *amicus* statement adopting the Comptroller's brief.

The day following Comptroller Lindberg's refusal to honor the vouchers two suits for injunctive and declaratory relief were filed in the Cook County circuit court. The State Superintendent and the Superintendent of the Education Service Region of Cook County sued Comptroller Lindberg challenging his refusal to honor the August vouchers for State aid to Cook County schools as certified by Superintendent Cronin. The Chicago Board of Education (Chicago Board) and Dr. Joseph P. Hannon, in his official capacity as General Superintendent of Schools of the Chicago Board and in his individual capacity as a citizen, resident, and taxpayer, sued both Superintendent Cronin and Comptroller Lindberg, challenging the validity of any reduction in State aid under section 18—12 of the School Code. The two actions were consolidated, and the trial court ordered the distribution of State aid funds, to the extent not disputed, to Cook County schools, pending decision of the consolidated suits.

At the September 14 hearing on the consolidated actions the trial court suggested counsel for all parties first argue the issue of the constitutionality of that portion of section 18—12 which provided for a reduction in State aid to those school districts failing to comply with the required minimum number of days of actual pupil attendance. The court suggested if that provision were to be found invalid, the other issues became moot, and, if a reviewing court reversed the finding of invalidity and remanded, further hearings on those other issues could then be held. The parties proceeded accordingly, the trial

court held the reduction provision of section 18—12 unconstitutional and further found "there is no just reason to delay the enforcement or appeal of this order." Both Superintendent Cronin and Comptroller Lindberg appealed, and we set an expedited schedule for briefing and oral argument.

After the September 14 decision of this case in the trial court the second paragraph of section 18—12 was amended in a special session of the legislature. Effective September 28 that paragraph reads:

> "If, for any school year before the 1975-1976 school year, any school district fails to provide the minimum school term specified in Section 10—19, the State aid claim shall be reduced by the State Superintendent of Education in an amount equivalent to 1% for each day less than the number of days required by this Act. If, for the 1975-1976 school year or any school year thereafter, any school district fails to provide the minimum school term specified in Section 10—19, the State aid claim shall be reduced by the State Superintendent of Education in an amount equivalent to .56818% for each day less than the number of days required by this Act. However, if the State Superintendent of Education determines that such failure to provide the minimum school term was occasioned by an act or acts of God, the State aid claim need not be reduced." (Pub. Act 79—6th SS—1.)

The net effect of this amendment is to retain for all pre-1975-1976 school years the flat reduction of 1% per day for each day below the minimum as the statute originally provided, but to limit that reduction for the 1975-1976 and subsequent school years to .56818%, the decimal equivalent of 1/176. That amendment is applicable to this case (*Rios v. Jones* (1976), 63 Ill. 2d 488, 494; *Community Consolidated School District No. 210 v. Mini* (1973), 55 Ill. 2d 382), and reduces from $53.26 million to $30.26 million the amount to be deducted from State aid to Chicago's schools.

We turn now to a consideration of the issues. As amended, the Chicago Board complaint alleged that

section 18—12 was irreconcilably repugnant to article X, section 1, of the Constitution of 1970, requiring an efficient system of high quality public educational institutions and services, and to section 34—18(1) of the School Code, requiring the Chicago Board to maintain schools for not less than nine months; that closing the schools during the strike was in the nature of an act of God and thus expressly exempt from the reduction provisions of section 18—12; and that closing during June was compelled by the nonexistence of funds. It was further alleged that the Board's actions were undertaken in good faith, that the penalty is excessive and constituted an illegal forfeiture, that it discriminates against poorer school districts and has a marked racially discriminatory effect on Chicago school children; and that section 18—12 violates the due process and equal protection clauses of the United States and Illinois constitutions. The trial court's order found section 18—12 of the School Code to be a penal statute which contravened the Illinois Constitution's goal that the State bear primary responsibility for financing public education; that the Chicago Board had been precluded from maintaining a full school term by the strike and the lack of State and local financial resources; that section 18—12 is unconstitutional, inequitable, and void insofar as it permitted the exaction of a harsh and excessive penalty against the Chicago Board; that equity required the penalty be vacated; and that the second paragraph of section 18—12 is an unconstitutional delegation of legislative power to an administrative official without sufficient guidelines or procedural safeguards.

We agree with the defendants in the case brought by the Chicago Board and its superintendent that neither plaintiff has standing to question the validity of the reduction provision of section 18—12 on due process grounds. Boards of education and school districts are governmental agencies created by the legislature and subject to its will. (*People ex rel. Taylor v. Camargo*

*Community Consolidated School District No. 158* (1924), 313 Ill. 321-27; *Trustees of Schools v. Tatman* (1851), 13 Ill. 27.) Due process guarantees, in the ordinary sense, do not extend to them. (*People ex rel. Dixon v. Community Unit School District No. 3* (1954), 2 Ill. 2d 454, 466; *People v. Deatherage* (1948), 401 Ill. 25, 32.) A school board may, however, assert a denial of equal protection of the laws if it is a member of a class being discriminated against (*Board of Education v. Bakalis* (1973), 54 Ill. 2d 448, 467; see also *City of Carbondale v. Van Natta* (1975), 61 Ill. 2d 483, 488; *Leno v. St. Joseph Hospital* (1973), 55 Ill. 2d 114, 121), and the allegation that the effect of the reduction in State aid here was to discriminate "against relatively poorer school districts such as Chicago" merits consideration. That board did not, however, have standing to protest alleged racial discrimination, since it is not a member of the protected class of pupils (*Board of Education v. Bakalis* (1973), 54 Ill. 2d 448, 467), nor is the Board's superintendent in any different position, for he is controlled by the same considerations applicable to the Board. Moreover, his position as a taxpayer does not permit him to challenge the statute's constitutionality without allegations of its injurious effect upon him (*Hamer v. Board of Education* (1970), 47 Ill. 2d 480, 483) which are not present here.

The major issue in the Chicago Board case is whether the provisions of section 18—12 for reduction of State aid to noncomplying districts are compatible with section 1 of article X of the Illinois Constitution, which reads as follows:

> "A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities.
>
> The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law.

The State has the primary responsibility for financing
the system of public education."

The trial court found that the aid reduction statute
violated the constitutional goal expressed in the third
paragraph of this section. In *Blase v. State* (1973), 55 Ill.
2d 94, 100, we considered the question whether that
paragraph required the State to provide at least 50% of the
cost of public education and said:

> "In view of the history of the proposal and
> the repeated explanations of its principal sponsor,
> it cannot be said that the sentence in question
> was intended to impose a specific obligation on
> the General Assembly. Rather its purpose was to
> state a commitment, a purpose, a goal."

(See also *People ex rel. Carey v. Board of Education*
(1973), 55 Ill. 2d 533, 535.) The basic thrust of the
Chicago Board's argument is that the legislature may not
reduce State aid to any school district because such action
would amount to a retreat from its obligation to advance
toward primary responsibility for financing education.
With this we cannot agree. We have recently upheld
withholding State aid benefits from school districts which
fail to qualify for them. (*People ex rel. Board of Education
v. State Board of Education* (1976), 62 Ill. 2d 517, 520.)
In our view, the reduction required by section 18—12 of
the School Code is not an unlawful penalty taking away
funds which in any way "belong" to the Chicago Board,
but rather it is simply the recovery of State aid which was
paid in advance but which the Chicago Board was not
entitled to as a result of its failure to comply with the
requirements for eligibility as set forth in the School Code.
The Chicago Board refers us to *Harwell v. Sheffield* (Fla.
1957), 112 So. 2d 377, for the proposition that strict
compliance with statutory conditions to receiving State aid
is not required of a school district taxing at its maximum
legal rate. But that court found substantial compliance
with the conditions and further based its decision on the

intent of the legislature. Here, the Chicago Board cannot be said to have in effect complied with the minimum school year requirement of 176 days. And if there was any doubt that the legislature did not intend the statute to render the Chicago Board ineligible for the aid claimed under the facts and circumstances of this case, it was resolved by the amendment to the statute subsequent to the trial court's decision in this case.

The trial court also found the reduction provision to be a penal statute which must be strictly construed and that the penalty was "harsh and excessive," making that section "unconstitutional, inequitable, and void." Whether or not this is a penal statute, a rule of strict construction will not be applied in order to defeat the clearly expressed intent of the legislature. (3 Sutherland, Statutes and Statutory Construction sec. 59.06 (4th ed. 1974).) We earlier noted that amendment of this section after the trial court's decision makes clear beyond any doubt the intent that it apply to the Chicago Board notwithstanding the teacher strike and alleged lack of resources. It is not the function of this court to question the wisdom of legislation which does not contravene constitutional safeguards. *Jacobson v. Lenhart* (1964), 30 Ill. 2d 225, 227; *City of Champaign v. City of Champaign Township* (1959), 16 Ill. 2d 58, 69.

Nor do we believe that section 18—12 violates that portion of section 1 of article X of the Illinois Constitution which states: "The State shall provide for an efficient system of high quality public educational institutions and services." A strong presumption of constitutionality exists and must be overcome if we are to invalidate the statute. (*Livingston v. Ogilvie* (1969), 43 Ill. 2d 9, 12.) The trial court did not find a violation of this portion of the Constitution, and we agree. This court has consistently held that the question of the efficiency of the educational system is properly left to the wisdom of the legislature. (*McLain v. Phelps* (1951), 409 Ill. 393, 398; *People v.*

*Deatherage* (1948), 401 Ill. 25, 31; *People ex rel. Taylor v. Camargo Community Consolidated School District No. 158* (1924), 313 Ill. 321, 328.) Furthermore, it seems to us that the requirement of a minimum school term is relevant to providing high quality, efficient education on a statewide basis. Conditioning entitlement to State aid on compliance with minimum term requirements seems to us entirely consistent with the goals set forth in the Constitution and an effective means of enforcing compliance. Arguments that the amount of State aid is of greater importance to education than the length of the school term should be directed to the legislature, not the judiciary.

There is, in our opinion, simply no constitutuional requirement that a legislature distribute State aid funds without conditioning a school district's receipt thereof upon compliance with certain basic, minimum educational requirements. And we find no constitutional proscription against reducing the amount of State aid to noncomplying districts in the same proportion as it is given.

The trial court also found a violation of the separation of powers clause (Ill. Const. 1970, art. II, sec. 1), in the provision of section 18—12 that "if the State Superintendent of Education determines that such failure to provide the minimum school term was occasioned by an act or acts of God, the State aid claim need not be reduced." This was apparently construed by the trial judge as vesting in the State Superintendent an unlimited discretion to choose those circumstances in which the "act of God" exception would be applied. In this we believe the trial judge erred. A legislature need not, of course, define in detail every possible instance to which a statute may apply. Generic descriptions are sufficient (*Stein v. Howlett* (1972), 52 Ill. 2d 570, 580), and all that is required is an intelligible standard (*Hoogasian v. Regional Transportation Authority* (1974), 58 Ill. 2d 117, 130; *Paepcke v. Public Building Com.* (1970), 46 Ill. 2d 330, 346; *Hill v. Relyea* (1966), 34

Ill. 2d 552, 555; *Memorial Gardens Association v. Smith* (1959), 16 Ill. 2d 116, 131). We believe that "act of God" is a sufficiently defined standard which needs no further elaboration here. (See *Phelps v. School District No. 109* (1922), 302 Ill. 193, 195; *Wald v. Pittsburg, Cincinnati, Chicago and St. Louis R.R. Co.* (1896), 162 Ill. 545, 550; *Merchants' Despatch Co. v. Smith* (1875), 76 Ill. 542, 544; *Parmelee v. Lowitz* (1874), 74 Ill. 116, 117; 1 C.J.S. *Act of God* 1423 (1936).) It is also urged that the phrase "need not be reduced" gives the Superintendent unguided discretion to reduce State aid even if the failure to provide the minimum term was due to an act of God. Courts normally construe statutes to achieve constitutionality if such construction is not unreasonable. (*Board of Library Directors v. City of Lake Forest* (1959), 17 Ill. 2d 277, 285; *People ex rel. Gregg v. Tauchen* (1953), 415 Ill. 91, 103.) The phrase is not without some ambiguity, but considered with what appears to be the clear purpose of the second paragraph of the section to compel compliance with minimum school term requirements, we believe the intent clear that reduction in State aid was to occur unless the violation of the minimum term requirements actually resulted from an act of God.

Finally, on this point, the Chicago Board also argues that the teacher strike was an act of God. Apparently two courts have analogized strikes to acts of God. (*McNamara Construction of Manitoba, Ltd. v. United States* (U.S. Ct. Cl. 1975), 509 F.2d 1166, 1170; *Southern Cotton-Oil Co. v. Louisville & Nashville R.R. Co.* (1915), 15 Ga. App. 751, 753, 84 S.E. 198, 199.) In neither case was the ultimate holding dependent on this issue, however, and the circumstances there involved substantial violence. We do not regard those cases as authority for the Chicago Board's position here. To now hold that a labor strike is an act of God would be an unwarranted expansion of this State's settled definition of act of God to one including human conduct. Morover, it is undisputed that seven of the lost

strike days were later added to the calendar, and no reduction in State aid would have occurred had it not been for the subsequent decision to close the schools earlier because of a lack of funds. A holding that the strike was an act of God is of no benefit to the Chicago Board unless it is assumed that the shortage of funds resulted from the Board's agreement to pay higher salaries in order to end the strike, allegations which the Chicago Board has studiously avoided.

That board's final argument is that it was impossible to keep the schools open, and that compliance with the statutory minimum term ought therefore to be excused. But the Board failed to prove impossibility in the legal sense, and its argument for forgiveness should be addressed to the legislature.

Since we hold the General Assembly may, in providing a statewide system of education, require a reduction in the amount of State aid to those school districts which fail, for reasons other than an act of God, to comply with minimum requirements as to the length of the school year, the question remains whether the State Superintendent of Education may apportion that reduction over a 3-year period. As earlier noted, that question was not ruled on by the trial court. It is, however, basically a question of statutory interpretation, and the facts necessary to its determination are in the record before us. The Superintendent and Comptroller have briefed and argued the issue here, and urge that we consider it. Because of its public importance we have determined to do so. Rule 366(a)(5), 58 Ill. 2d R. 366(a)(5); *Gatto v. Walgreen Drug Co.* (1975), 61 Ill. 2d 513, 520; *Doran v. Cullerton* (1972), 51 Ill. 2d 553, 558.

Among the relevant provisions of the School Code (Ill. Rev. Stat. 1975, ch. 122, par. 1—1 *et seq.*) are section 2—3, which vested in the former Superintendent of Public Instruction certain duties subsequently vested by section 1A—4(C) in the State Board of Education (Board) by

whom section 1A–4(B) provides the State Superintendent of Education is to be appointed as the Board's chief executive officer. Among those duties was that set forth in section 2–3.33:

> "To recompute within 3 years from the final date for filing of a claim any claim for reimbursement to any school district if the claim has been found to be incorrect and to adjust subsequent claims accordingly."

It is to this section that the Superintendent points for his authority.

It is apparent from the Code as a whole and particularly article 18, which deals with the financing of the common school fund from which State aid is paid, the formula for computing the amounts of State aid to the various districts, and the manner of its payment, that State aid is paid monthly in advance to each district in an amount estimated as that to which the district will be entitled for the current year predicated on the reports filed by the district at the conclusion of the preceding school year. Where, because of a shorter-than-required school term, or errors such as in payment or computation, it is determined that a district was paid more in State aid than it was entitled to, it is agreed that the practice has been to recoup the overpayment by reducing the State aid payments during the ensuing year. The Comptroller apparently does not dispute the propriety of this practice if the amount to be recouped is prorated over the ensuing 1-year period. He argues, however, that it cannot be prorated over a longer period.

The statutory provisions contained in article 18 were drafted under different State aid distribution schemes and are not entirely precise in the context of the current distributive scheme. Ambiguities are present which are not readily apparent from reading the language of a particular section. Thus the direction in section 18–12 that "[i]f *** any school district fails to provide the minimum school term *** the State aid claim shall be reduced," although clear and easily applied in a reimbursement method of

distribution, is less so in a prepayment method where the claim has in effect already been paid in its unreduced form and the excess must be recovered. It seems clear that the article contemplates an adjustment of future payments, as is the current practice, rather than immediate repayment by the school district as the means for recovering the excess payments. The time frame in which these adjustments may be made is, however, not specified. Section 18—2 provides for annual adjustment of amended claims, section 2—3.33 provides for recomputation within 3 years of incorrect claims and adjustment of subsequent claims, but no section provides a specific time reference for reduced claims or spells out how the adjustments are to be made.

In view of the conclusion which we reach, we believe it would only extend an already lengthy opinion were we to set forth and discuss in detail the Comptroller's arguments. We agree with him that the statutory provisions are not entirely harmonious, and his arguments are not without some force. But it is not disputed that since 1968 there have been some 20 occasions where the State Superintendent or his predecessor has adjusted State aid claims over periods up to 3 years, and it has frequently been held that the interpretation of a less than totally clear statute by the administrative body charged with its application is persuasive (*American Oil Co. v. Mahin* (1971), 49 Ill. 2d 199, 205, and cases there cited). Additionally, the debates of the General Assembly in the 1976 special session earlier referred to indicate its reluctance to statutorily alter the Superintendent's decision to prorate the reduction over a 3-year period. The pending suits litigating the permissibility of the Superintendent's action were repeatedly mentioned in the debates, and the only clear expression of legislative intent is evidenced by a House amendment, passed by a wide margin (84 to 54), to, in the words of one of its supporters, "codify and put into our statutes" the policy of the Superintendent "of

spreading out any penalty for early school closing over a three-year period" (House Debates, Sept. 15, 1976, at 11). While the amendment was later stricken in the belief that it was not germane to the limited purposes for which the special session had been called, we believe such inferences as can be drawn from the amendment's original passage, and the debates as a whole, support our conclusion as to the intent of the existing legislation. That intent is to provide for the school children of this State a school term consisting of at least 176 days of actual pupil attendance as is manifest in section 10–19. To read into the Code a requirement that excess State aid paid to a district must be completely recovered within the ensuing year could, in cases such as this where the excess amount is substantial, have the undesirable effect of contributing to early closing in that ensuing year, a result clearly contrary to the legislative purpose. Prorating over a 3-year period the recovery of substantial overpayments minimizes to the extent possible the necessity of additional early closings and the impact of recoupment upon the quality of the educational program within the affected district.

The Comptroller also urges that, if the reduction can be spread over the 3-year period, such decision can be made only by the State Board of Education and not by its Superintendent. It is true that the Superintendent has not specifically alleged that his action was directed or approved by the Board. But section 18–12 vests the reduction authority in the *Superintendent*, and, insofar as section 2–3.33 may be thought to vest adjustment authority in the Board, we will presume, in the absence of a contrary assertion, that the proration of that reduction has been directed or approved by the Board.

The judgment of the circuit court of Cook County is accordingly reversed and the cause remanded with directions to dismiss the complaint in circuit court cause No. 76 CH 4922, and to enter in circuit court cause No. 76 L 15301 an appropriate declaratory judgment order.

*Reversed and remanded, with directions.*