JOHN A. JENKINS II *et al.*, Indiv. and as Natural Guardians of Their Children, Noreen Jenkins *et al., et al.,* Plaintiffs-Appellants, v. ROBERT LEININGER, State Superintendent of Education, *et al.,* Defendants-Appellees.

First District (5th Division)   No. 1—93—1456

Opinion filed December 22, 1995.

Daniel J. Kubasiak, of Kubasiak, Cremieux & Fylstra, of Chicago, and William H. Mellor III, Clint Bolick, Dirk G. Roggeveen, and Scott G. Bullock, all of Institute for Justice, and Mark Snyderman, of Gibson, Dunn & Crutcher, both of Washington, D.C., for appellants.

Patricia J. Whitten and Michael J. Hernandez, both of Chicago Board of Education, of Chicago, for appellee Chicago Board of Education.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and William K. Blanchard, Assistant Attorney General, of counsel), for appellees Robert Leininger and State Board of Education.

Harvey Grossman and Jane M. Whicher, both of The Roger Baldwin Foundation of ACLU, Inc., and Jeffrey M. Shaman, of De Paul University, both of Chicago, for *amicus curiae.*

JUSTICE GORDON delivered the opinion of the court:

Plaintiffs, 100 low-income schoolchildren enrolled in the Chicago public schools and their parents, filed the instant action against the defendants, Robert Leininger, State Superintendent of Education; the State Board of Education; and the Chicago Board of Education, seeking declaratory and injunctive relief. Plaintiffs' complaint alleged violation of article 10, section 1, of the Illinois Constitution (Ill. Const. 1970, art. X, § 1), which guarantees an efficient and high quality education; violation of the equal protection clauses of the United States and Illinois Constitutions (U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2); and violation of the first, ninth and fourteenth

amendments to the United States Constitution (U.S. Const., amends. I, IX, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2), alleging deprivation of parental rights to control and influence the education of their children. The plaintiffs sought a declaration of their rights and an injunction diverting control over State education funds in the common school fund allocated pursuant to section 18—8 of Illinois School Code (105 ILCS 5/18—8 (West 1992)) from the Chicago public schools to the plaintiff parents so that they could secure an education for their children in a public or private school of their choice. The trial court dismissed plaintiffs' complaint with prejudice, finding that the plaintiffs failed to state a cause of action, and the plaintiffs appeal. On motion, this court allowed the filing of an *amicus curiae* brief that supports the dismissal of plaintiffs' complaint, due to its conclusory pleading, but seeks the filing of an amended complaint realleging violations of the constitutional right to a high quality education and of the equal protection clauses to the Federal and State Constitutions.[1]

The issues presented for review are: whether the Illinois Constitution imposes a duty to provide an efficient and high quality education to all schoolchildren in the State and, if so, whether that duty is satisfied by the legislative enactment of the Illinois School Code (105 ILCS 5/1—1 through 35—30 (West 1992)) (the School Code); whether the complaint alleges facts sufficient to establish an equal protection violation of the Illinois and United States Constitutions; whether the complaint alleges facts sufficient to establish a deprivation of the right to parental liberty to control the child's education; and whether the court has judicial authority to enjoin the allocation of State education funds to the Chicago public schools.

A section 2—615 (735 ILCS 5/2—615 (West 1992)) motion to dismiss is used to attack deficiencies in a pleading. (*E.g.*, *Reuben H. Donnelley Corp. v. Brauer* (1995), 275 Ill. App. 3d 300, 655 N.E.2d 1162.) A cause of action should not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved under the pleadings which will entitle the plaintiff to recover. (*E.g.*, *Zadrozny v. City Colleges of Chicago* (1991), 220 Ill. App. 3d 290, 581 N.E.2d 44.) When ruling on a motion to dismiss, all well-pleaded facts in the complaint and all reasonable inferences arising therefrom are admitted as true (*Capitol Indemnity Corp. v. Stewart Smith Intermediaries, Inc.* (1992), 229 Ill. App. 3d 119, 593 N.E.2d 872) and are interpreted

---

[1]The *amicus curiae* brief also argues against the remedy sought by the plaintiffs and would seek alternatively a court order requiring improvement of the public school system.

in a light most favorable to the plaintiff. (*Michael Reese Hospital & Medical Center v. Chicago HMO, Ltd.* (1990), 196 Ill. App. 3d 832, 554 N.E.2d 472. *Cf. Claire Associates v. Pontikes* (1986), 151 Ill. App. 3d 116, 502 N.E.2d 1186 (liberal construction of pleadings will not cure factual deficiencies).) Conclusions in a complaint, unsupported by fact, are not accepted as true (*Committee for Educational Rights v. Edgar* (1994), 267 Ill. App. 3d 18, 641 N.E.2d 602); and where recovery is sought on the basis of constitutional violations, it is not sufficient to allege those violations generally; rather, specific facts must be set forth to rebut the presumption of constitutionality. *Lee v. Pucinski* (1994), 267 Ill. App. 3d 489, 642 N.E.2d 769.

■ Article X, section 1, of the Illinois Constitution of 1970 provides in pertinent part as follows:

"§ 1. Goal—Free Schools

A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities.

The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law." (Ill. Const. 1970, art. X, § 1.)

There is no question that this article mandates that the legislature provide an efficient, high quality educational system which is free to the public. *Allen v. Maurer* (1972), 6 Ill. App. 3d 633, 640, 286 N.E.2d 135, 140 ("the State has a constitutional duty to provide and the public has a right to receive an efficient, high quality educational system"); see *Elliot v. Board of Education* (1978), 64 Ill. App. 3d 229, 380 N.E.2d 1137 (holding legislature was required to provide a system of free education to the public including programs for the handicapped). See also 2 Record of Proceedings, Sixth Illinois Constitutional Convention 764 (remarks of Delegate Samuel A. Patch, member of the Committee on Education: "The state is mandated to provide a system that is thorough, complete, and useful to all the people of Illinois").

In *Pierce v. Board of Education* (1977), 69 Ill. 2d 89, 370 N.E.2d 535, our supreme court held that article X, section 1, of the Illinois Constitution of 1970 pronounced a statement of general philosophy. The court stated that the article was not self-executing and did not "mandate that certain means be provided in any specific form." 69 Ill. 2d at 93, 370 N.E.2d at 536; see also *Cronin v. Lindberg* (1976), 66 Ill. 2d 47, 58, 360 N.E.2d 360, 365 ("the question of the efficiency of the educational system is properly left to the wisdom of the legislature"); *Board of Education, School District No. 150 v. Cronin*

(1977), 51 Ill. App. 3d 838, 367 N.E.2d 501 (the question of efficiency and fairness of school system established by legislative action is solely for legislature to answer).

A similar interpretation was given to article X's predecessor in the Illinois Constitution of 1870, which required that "[t]he General Assembly shall provide a thorough and efficient system of free schools, whereby all children of this State may receive a good common school education." (Ill. Const. 1870, art. VIII, § 1.) In *People ex rel. Leighty v. Young* (1923), 309 Ill. 27, 139 N.E. 894, the court held that this constitutional provision provided the legislature with both a mandate, to provide a thorough and efficient system of schools, and a limitation, to provide a free system. (See also *People v. Deatherage* (1948), 401 Ill. 25, 81 N.E.2d 581 (the legislature has two limitations, that the system be free and that it be open to all without discrimination).) The court further noted in *Young*, however, that, while the legislature had no discretion with respect to providing the system, it had "unquestioned power and discretion, within the limits stated, to determine what a common school education shall be." (*Young*, 309 Ill. at 34, 139 N.E. at 897; see *Elliot v. Board of Education*, 64 Ill. App. 3d at 235, 380 N.E.2d at 1141 (under the Illinois Constitution of 1870 "the legislature was left free to determine the content of the curriculum to be taught by the public schools").) With respect to that discretion, the supreme court stated in *People v. Deatherage*:

"This court has also been consistent in holding that the question of the efficiency and thoroughness of the school system established by legislative permission is one solely for the legislature to answer and that the courts lack power to intrude. [Citations.] In *Fiedler v. Eckfeldt* [(1929)], 335 Ill. 11, we said, it was not for the court to determine if the system is the best which could be brought forth. School problems are essentially practical ones,—what is best cannot be easily answered. 'It is no more within the authority of the court to pass judgment upon the thoroughness and efficiency of the system, or any part of it, than to determine whether the laws enacted for the protection of operative miners, in compliance with section 29 of article 4 of the constitution, are such as necessary for that purpose; *** All these questions have been held to be matters for legislative determination, with which the courts have no right to interfere. *** Even if the legislative intent might be thought crude or unwise and the law unjust or oppressive, errors of legislation are not subject to judicial review unless they exceed some limitation imposed by the constitution. Within those limitations the legislative power is supreme and judicial power cannot interfere with it.' " *Deatherage*, 401 Ill. at 31, 81 N.E.2d at 586.

(See *People ex rel. Taylor v. Camargo Community Consolidated School District No. 158* (1924), 313 Ill. 321, 327-28, 145 N.E. 154, 156 (whether the amendment complained of "tends to affect adversely or favorably the thoroughness and efficiency of the system of free schools is a legislative question which is not for [judicial] determination").) As there has been no indication that the Constitutional Convention intended to alter the line of cases in which the courts have deferred to the legislature on the meaning of the descriptive terms found in article X, section 1 (see generally Ill. Ann. Stat., 1970 Const., art. X, § 1, Constitutional Commentary, at 256 (Smith-Hurd 1971)), unless some constitutional limitation has been exceeded, we lack power to intrude where the legislature has exercised its discretion. *Cronin v. Lindberg*, 66 Ill. 2d 47, 360 N.E.2d 360; *People v. Deatherage*, 401 Ill. 25, 81 N.E.2d 581; *Fiedler v. Eckfeldt* (1929), 335 Ill. 11, 166 N.E. 504; *People ex rel. Taylor v. Camargo Community Consolidated School District No. 158*, 313 Ill. 321, 145 N.E. 154.

■ Pursuant to the mandate of the education article, the Illinois legislature enacted the Illinois School Code (105 ILCS 5/1—1 *et seq.* (West 1992)), thereby creating a comprehensive system of public education. In the instant case, the trial court took judicial notice of the School Code and the legislature's delegation therein of duties and powers to the State Board of Education (see 105 ILCS 5/2—3 through 2—3.106 (West 1992)) and to the Chicago Board of Education (see 105 ILCS 5/34—1 through 34—21.6 (West 1992)). The court noted that a significant portion of the School Code was devoted to the Chicago public schools and cited to the enactment of special legislation for reform of those schools by the creation of the School Finance Authority Act (Pub. Act 81—1221, eff. January 16, 1980 (now codified at 105 ILCS 5/34A—101 through 34A—608 (West 1994)), to provide fiscal oversight and assistance with educational reform, and the creation of local school councils, to provide parental and community input in local school administration (see Pub. Act 85—1418, eff. July 1, 1989 (now codified at 105 ILCS 5/34—2.1 (West 1994)). Based upon the legislature's enactment of the School Code, the court dismissed count I of the plaintiffs' complaint, finding that the legislature had complied with the constitutional mandate to provide an efficient educational system of sufficient quality, and based upon the plaintiffs' failure to identify any unconstitutional statutory provision in the School Code.

On appeal, the plaintiffs do not contend that the School Code or any provision therein is unconstitutional on its face. Rather, the plaintiffs contend that the State Superintendent and the State and local boards of education have not fulfilled the duties delegated to them by the School Code such that the plaintiff school children have been deprived of an efficient and high quality education.

■ As noted above, the Illinois Constitution guarantees all persons in the State an efficient educational system, and the duty to provide such a system rests with the legislature. It is a goal of the State that the educational institutions and services provided be high quality. Questions of efficiency and quality have historically, and for practical reasons, been left to the discretion of the legislature and the courts will not intrude unless the legislature has exceeded some constitutional limitation. (See, *e.g.*, *Cronin v. Lindberg*, 66 Ill. 2d 47, 360 N.E.2d 360; *People v. Deatherage*, 401 Ill. 25, 81 N.E.2d 581.) Similarly, where the legislature, pursuant to statute, has empowered a school board to perform certain functions, "the courts will not interfere with the exercise of such powers or substitute their discretion for that of the school board unless the board's action is palpably arbitrary, unreasonable or capricious." (*Tyska v. Board of Education of Township High School District 214* (1983), 117 Ill. App. 3d 917, 922, 453 N.E.2d 1344, 1350.) Here, as the trial court noted, the plaintiffs' complaint identified no specific acts by State or local school officials that were arbitrary, unreasonable or capricious. The plaintiffs' complaint was replete with generalities such as "[b]y any objective measure, defendants have not provided to plaintiff students efficient or high quality public educational institutions and services)"; "[d]efendants have failed to provide schools that successfully encourage students to remain until graduation"; and "the schools *** do not consistently provide the basic skills necessary to function effectively as citizens." The complaint sets forth statistical information concerning drop-out rates; inadequate reading, mathematics and language arts scores; dangerous conditions of crime and drugs on school premises; and lack of autonomy for teachers and parents. While the plaintiffs' complaint identified existent conditions and performance results at plaintiffs' schools, it did not attribute these effects to any unconstitutional statute or to any specific statutory violation by any of the named defendants. The fact that improvement is needed at the plaintiffs' schools does not establish a constitutional deprivation by the defendants of plaintiffs' right to an education. Other than alleged equal protection violations, which will be discussed below, plaintiffs have not alleged actionable conduct that was palpably arbitrary, unreasonable or capricious (*Tyska v. Board of Education of Township High School District 214*, 117 Ill. App. 3d 917, 453 N.E.2d 1344). Thus, their complaint failed to state a cause of action under article X of the Illinois Constitution of 1970.

Count II of the plaintiffs' complaint alleged that the plaintiff schoolchildren were deprived of "an equal opportunity to obtain a constitutionally adequate education" due to defendants' creation of a

"caste system" and by assigning them to inadequate schools and depriving their parents of essential control over their education. The plaintiffs alleged that due to their economic circumstances, they were assigned, without choice, to neighborhood schools attended by other similarly situated low-income students. They alleged that they were not provided with basic skills necessary to function in society; that the schools they attended had drop-out rates significantly higher and standardized test scores significantly lower than the average of other school districts in the State; and that the schools they attended were crime-ridden, drug-infested and dangerous. While recognizing that the per-student funds spent on Chicago public schools was greater than the statewide average, plaintiffs alleged that a greater portion was spent on administrative expenses rather than classroom instruction. The plaintiffs further alleged that numerous private schools existed in their neighborhoods, drawing from the same student population, that offered better educational opportunities and allowing for extensive parental involvement and control.

■ This court uses the same analysis in assessing equal protection claims brought under the United States and Illinois Constitutions. (*Nevitt v. Langfelder* (1993), 157 Ill. 2d 116, 623 N.E.2d 281; *Safanda v. Zoning Board of Appeals* (1990), 203 Ill. App. 3d 687, 561 N.E.2d 412.) As a prerequisite for an equal protection claim, the party challenging a law must show that it classifies persons in an arbitrary and unreasonable manner that is wholly irrelevant to the achievement of the State's objective. (*People v. Wegielnik* (1992), 152 Ill. 2d 418, 605 N.E.2d 487; *Opyt's Amoco, Inc. v. Village of South Holland* (1991), 209 Ill. App. 3d 473, 568 N.E.2d 260, *aff'd* (1992), 149 Ill. 2d 265, 595 N.E.2d 1060.) As noted in *People v. Shephard* (1992), 152 Ill. 2d 489, 499, 605 N.E.2d 518, 523:

> "The guarantee of equal protection requires that government deal with ' "similarly situated" ' individuals in a similar manner. [Citations.] The equal protection clauses of the United States and Illinois Constitutions do not deny the State the power to draw lines that treat different classes of persons differently. [Citations.] However, the guarantee of equal protection prohibits the State from according unequal treatment to persons placed by a statute into different classes for reasons wholly unrelated to the purpose of the legislation."

■ Two standards of judicial review are applied in determining whether the State has created unconstitutional classifications. Initially, the court must determine if the statute under consideration affects a "fundamental right" or discriminates against a suspect class. In that case, a strict scrutiny test will be applied, and the stat-

ute will be upheld only if it is narrowly tailored to serve a compelling State interest. (*Kalodimos v. Village of Morton Grove* (1984), 103 Ill. 2d 483, 470 N.E.2d 266.) Where neither a "fundamental right" nor a suspect class is involved, a legislative enactment is presumptively valid and will survive constitutional scrutiny if it is rationally related to a legitimate governmental purpose. (*Nevitt v. Langfelder* (1993), 157 Ill. 2d 116, 623 N.E.2d 281; *City of Batavia v. Allen* (1991), 218 Ill. App. 3d 545, 578 N.E.2d 597.) Under the rational relationship test, the means chosen to achieve a governmental objective need not be the best possible means; they need only be measures that rational people believe might help to achieve the objective. *Garcia v. City of Chicago* (1992), 240 Ill. App. 3d 199, 608 N.E.2d 239.

On appeal, the plaintiffs contend that the right to an education is a "fundamental right," the alleged deprivation of which should be analyzed under the strict scrutiny or compelling State interest test. There can be no doubt that education plays a fundamental and essential role in a democratic society. As noted in *San Antonio Independent School District v. Rodriguez* (1973), 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278:

> " '[Education] is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.' "
> (*Rodriguez*, 411 U.S. at 30, 36 L. Ed. 2d at 41, 93 S. Ct. at 1295, quoting *Brown v. Board of Education* (1954), 347 U.S. 483, 493, 98 L. Ed. 873, 880, 74 S. Ct. 686, 691.)

Social importance, however, is not the critical determinant for subjecting State legislation to strict scrutiny. (*Rodriguez*, 411 U.S. at 32, 36 L. Ed. 2d at 42, 93 S. Ct. at 1296, citing *Lindsey v. Normet* (1972), 405 U.S. 56, 31 L. Ed. 2d 36, 92 S. Ct. 862.) The term "fundamental right" is a term of art and creature of constitutional construction subject to a body of precedent that limits judicial review under the standard of strict scrutiny. (See *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278; *People v. Shephard* (1992), 152 Ill. 2d 489, 605 N.E.2d 518; *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 470 N.E.2d 266.) The United States Supreme Court and our State supreme court have repeatedly admonished that courts have "a responsibility not to engage in the creation of substantive constitutional rights *** ' "in the name of guaranteeing equal protection of the laws." ' " (*People v. Kaeding* (1983), 98 Ill. 2d 237, 246, 456 N.E.2d 11, 16-17, quoting *In re*

*Roger B.* (1981), 84 Ill. 2d 323, 327, 418 N.E.2d 751, 753, quoting *San Antonio Independent School District v. Rodriguez,* 411 U.S. at 33, 36 L. Ed. 2d at 43, 93 S. Ct. at 1297.) While almost every State statute affects an important right, courts must refrain from characterizing all important rights as fundamental such that in the process they become "super-legislatures." *Rodriguez,* 411 U.S. at 31, 36 L. Ed. 2d at 41, 93 S. Ct. at 1295, quoting *Shapiro v. Thompson* (1969), 394 U.S. 618, 655, 22 L. Ed. 2d 600, 627, 89 S. Ct. 1322, 1342 (Harlan, J., dissenting).

■ A constitutional right will be characterized as fundamental only where such a conclusion is supported by textual evidence as well as evidence of the intent of the drafters. (See *People ex rel. Tucker v. Kotsos* (1977), 68 Ill. 2d 88, 368 N.E.2d 903.) Here, neither the text nor the history of the education article of the Illinois Constitution of 1970 supports a conclusion that the right to a high quality education is a "fundamental right." The more appropriate conclusion is that a high quality education is a goal to be strived for. Nowhere in the Illinois Constitution or in the 1970 Constitutional Convention proceedings do the words "fundamental right" appear. The caption to the education article contains the word "goal." The word "goal" appears again in the first sentence of that article wherein it is stated that the educational development of all persons in the State is a "fundamental goal."[2]

The conclusion that education is not a "fundamental right" under the Illinois Constitution recently was reached by our court in *Committee for Educational Rights v. Edgar* (1994), 267 Ill. App. 3d 18, 641 N.E.2d 602 (educational development of all persons is a goal not a fundamental right).[3] (See also *Pierce v. Board of Education* (1977), 69 Ill. 2d 89, 92, 370 N.E.2d 535, 536, quoting Ill. Const. 1970, art. X, § 1 (article X, section 1, pronounces a "laudable goal of 'the educational development of all persons' "); *cf. Fumarolo v. Chicago Board of Education* (1990), 142 Ill. 2d 54, 88, 566 N.E.2d 1283, 1298 ("[t]he administration of education through the operation of our schools is a fundamental governmental activity").) Similarly, the United States Supreme Court, in *San Antonio Independent School District v. Rodri-*

---

[2]We note that in the appendix to briefs submitted by the State defendants and by the Chicago Board of Education are certified copies of the November 3, 1992, election results regarding rejection by Illinois voters of a proposed constitutional amendment that stated "[t]he educational development of all persons to the limits of their capacities is a fundamental 'right.' "

[3]An appeal in this case is pending before the Illinois Supreme Court pursuant to the appellate court's certification that the case concerns a question of importance. 157 Ill. 2d R. 316.

*guez* (1973), 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278, held that education is not a "fundamental right" under the Federal constitution. While that court recognized education as a vital governmental function, it stated that "the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause" (*San Antonio Independent School District v. Rodriguez*, 411 U.S. at 30, 36 L. Ed. 2d at 41, 93 S. Ct. at 1295). In view of this precedent, we are obliged to conclude that the right to a high quality education is not a "fundamental right" for purposes of an equal protection claim.

■ Absent allegations of infringement upon a fundamental right, the strict scrutiny test under an equal protection analysis is not applicable unless the plaintiffs can allege that they were members of a suspect class. (See *Nevitt v. Langfelder*, 157 Ill. 2d 116, 623 N.E.2d 281.) Here the plaintiffs alleged that they were members of the class of low-income families. However, poverty or lack of wealth is not a basis for declaring a suspect classification that would give rise to a strict scrutiny analysis under the equal protection clause. (*San Antonio Independent School District v. Rodriguez*, 411 U.S. at 28, 36 L. Ed. 2d at 40, 93 S. Ct. at 1294; *Hassan v. Wright* (7th Cir. 1995), 45 F.3d 1063 (indigents do not compose a suspect class); *Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 412 N.E.2d 151.) Thus, as plaintiffs cannot establish that education is a fundamental right or that they are members of a suspect class, count II of the plaintiffs' complaint must be analyzed by application of the rational basis test. See *Nevitt v. Langfelder*, 157 Ill. 2d 116, 623 N.E.2d 281; *Committee for Educational Rights v. Edgar*, 267 Ill. App. 3d 18, 641 N.E.2d 602.

A review of plaintiffs' complaint shows that it has failed to set forth factual allegations of disparate treatment that is not rationally related to a governmental purpose. Initially, we note that the plaintiffs have not alleged any laws, regulations or policies promulgated by the legislature or enforced by the defendants that unjustifiably or irrationally treated different classes of individuals or similarly situated individuals dissimilarly. (See *Safanda v. Zoning Board of Appeals*, 203 Ill. App. 3d 687, 561 N.E.2d 412.) The plaintiffs did not allege any deliberate or purposeful acts of dissimilar treatment by the defendants with respect to other economically disadvantaged students and parents in Chicago or other State school districts that deprived the plaintiff schoolchildren of an equal education or their parents of an equal opportunity to influence their children's education. See *Wayte v. United States* (1985), 470 U.S. 598, 84 L. Ed. 2d 547, 105 S. Ct. 1524; *People v. Wegielnik*, 152 Ill. 2d 418, 605 N.E.2d

487 (to support an equal protection claim, plaintiff must not only allege a discriminatory effect or inequality but the plaintiff must also allege acts of invidious or purposeful discrimination).

The class within which the plaintiffs categorized themselves, the economically disadvantaged, was not created by nor did it evolve from legislative or governmental action. While there may be some correlation between economic wealth and one's place of residence, such that school assignments based on residential location are indirectly influenced by income factors, the State's reliance on residence for school assignment determinations nevertheless is rationally related to the purpose of providing an educational system to all residents of the State.

Plaintiffs also summarily alleged that the Chicago public schools experienced higher administrative expenses than other schools statewide and that, as a result, less funds were spent proportionately on classroom instruction. Assuming plaintiffs' allegation to be true, plaintiffs did not allege the absence of a reasonable basis for such a system. See *San Antonio Independent School District v. Rodriguez*, 411 U.S. at 54-55, 36 L. Ed. 2d at 55, 93 S. Ct. at 1308 ("to the extent that the Texas system of school financing results in unequal expenditures between children who happen to reside in different districts, we cannot say that such disparities are the product of a system that is so irrational as to be invidiously discriminatory").

The gravamen of the plaintiffs' claim, however, appears to rest not on a statute or policy that was discriminatory on its face or as applied but, rather, on the creation of an educational system where conditions, results and effects were unequal. The equal protection clause guards against unequal treatment, not unequal results. (See *Personnel Administrator v. Feeney* (1979), 442 U.S. 256, 272, 273, 60 L. Ed. 2d 870, 883, 884, 99 S. Ct. 2282, 2292, 2293 ("[t]he calculus of effects, the manner in which a particular law reverberates in a society is a legislative and not a judicial responsibility"; "the Fourteenth Amendment guarantees equal laws, not equal results"); see also *Rodriguez*, 411 U.S. at 24, 36 L. Ed. 2d at 37, 93 S. Ct. at 1291 ("the Equal Protection Clause does not require absolute equality or precisely equal advantages").) Since the plaintiffs have failed to allege facts of unequal treatment by the defendants and since they cannot allege that the treatment afforded them was irrational and unrelated to the governmental interest in educating the people of the State, the plaintiffs did not sufficiently plead a denial of equal protection and that count of their complaint was properly dismissed.

In reaching this conclusion, we do not seek to minimize the conditions or problems that the plaintiffs recite in their complaint. The

task of providing a high quality education to all people of the State is a monumental one and one that has been constitutionally delegated to the legislature. As noted in *People v. Deatherage*, "[s]chool problems are essentially practical ones." (*Deatherage*, 401 Ill. at 31, 81 N.E.2d at 586.) They are problems that the judiciary are not equipped to handle and that are best left to the legislative and political process. We agree with the following concluding remarks of Mr. Justice Powell in *San Antonio Independent School District v. Rodriguez*:

> "[C]ertainly innovative thinking as to public education, its methods, and its funding is necessary to assure both a higher level of quality and greater uniformity of opportunity. These matters merit the continued attention of the scholars who already have contributed much by their challenges. But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them." 411 U.S. at 58-59, 36 L. Ed. 2d at 58, 93 S. Ct. at 1310.

■ In count III of their complaint, the plaintiffs sought recovery on the basis of deprivation of parental liberty. The plaintiff parents alleged that they were denied the right to direct, control and choose the educational environment of their children in violation of their rights of freedom of association, freedom of speech, and due process guaranteed by article 1, section 2, of the Illinois Constitution of 1970 and the first, ninth and fourteenth amendments to the United States Constitution. In dismissing this count, the trial court found that the plaintiffs failed to allege necessary facts to establish such a claim and failed to cite to any authority that would support such a claim.

On appeal, the plaintiffs refer to allegations in their complaint that, due to their economic status, they lack the financial leverage to remove their children from the public schools and they lack political leverage to influence school policies. The plaintiffs recognize enactment of reform legislation in 1991 intended to insure community and parental participation in the governing process of the Chicago public schools by the creation of local school councils (see 105 ILCS 5/34—2.1 *et seq.* (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 122, par. 34—2.1 *et seq.*)). They contend, however, that despite this legislation, their ability to exercise influence over the children's education remains "virtually nonexistent." In further support of their claim, that State action cannot unreasonably interfere with parental liberty to direct the upbringing and education of their children, the plaintiffs cite to *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 69 L. Ed. 1070, 45 S. Ct. 571, *Wisconsin v. Yoder* (1972), 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526, *Farrington v. Tokushige* (1927), 273 U.S. 284, 71 L. Ed.

646, 47 S. Ct. 406, and *Meyer v. Nebraska* (1923), 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 625.

As with counts I and II of the plaintiffs' complaint, count III lacks sufficient factual allegations. While there can be no dispute that parents have a primary role in the upbringing and education of their children (see *Wisconsin v. Yoder*, 406 U.S. at 232, 32 L. Ed. 2d at 34-35, 92 S. Ct. at 1541-42), the plaintiffs have not alleged how the defendants prevented them from exercising that role. (See 105 ILCS 5/26—1 (West 1992) (options available to parents who do not wish to enroll their children in public schools).) Moreover, unlike in the cases cited by plaintiffs, here there were no allegations of any unreasonable State interference. (See *Wisconsin v. Yoder*, 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (State law requiring compulsory school attendance to age 16 in violation of Amish tenets held to unconstitutionally interfere with traditional interest of parents with respect to religious upbringing of their children); *Farrington v. Tokushige*, 273 U.S. 284, 71 L. Ed. 646, 47 S. Ct. 406 (State law exercising excessive control over private foreign language schools unconstitutionally deprived parents of fair opportunity to procure instruction for their children); *Pierce v. Society of Sisters*, 268 U.S. 510, 69 L. Ed. 1070, 45 S. Ct. 571 (State law requiring attendance at public schools, to the exclusion of private schools, unconstitutionally interfered with liberty of parents to direct upbringing and education of their children); *Meyer v. Nebraska*, 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 625 (State law prohibiting instruction of children in language other than English unconstitutional).)[4] Rather, the plaintiffs allege that the social and economic conditions under which they exist prevent them from choosing alternative educational programs and from influencing decisions made within the public school system. While it may very well be true that the plaintiffs' economic conditions create an absence of choice, since plaintiffs cannot incur the expenses associated with private school attendance, plaintiffs' conclusion that that same condition prevents them from participating in local school decision making is unfounded and unsupported in fact (see 105 ILCS 5/34—1.02 *et seq.* (West 1992)). Accordingly, plaintiffs have not sufficiently alleged a claim in count III of their complaint and that count was properly dismissed by the trial court.

---

[4]The plaintiffs also cited *Planned Parenthood v. Casey* (1992), 505 U.S. 833, 120 L. Ed. 2d 674, 112 S. Ct. 2791. We fail to see the relevance of that case, which was concerned with a challenge by abortion providers to State regulations requiring that a minor obtain parental consent or judicial permission prior to the abortion.

328

■ The final issues raised in this appeal concern the remedial aspect to plaintiffs' claims. The plaintiffs sought injunctive relief diverting control over State education funds in the common school fund from the Chicago public schools to the plaintiff parents so that with their *pro rata* shares they could secure an education for their children in a public or private school of their choice. In dismissing plaintiffs' complaint, the trial court noted that it was without judicial authority to order a "voucher system." Plaintiffs argue on appeal, however, that they are not seeking a judicially established "voucher system" to be available to all students. Instead, they are seeking diversion only of their *pro rata* shares of funds allocated under the present statutory scheme. Plaintiffs further argue that precedent has been established allowing other students to "opt out of unsuitable public schools," namely, disabled children. Plaintiffs contend that such a remedy could be fashioned for them as well.

The issue of funding is extremely complex. Plaintiffs seek to oversimplify their remedy by limiting the relief to them alone. In so doing, they fail to adequately confront the ramifications of their remedy. As noted by the State defendants, plaintiffs do not confront constitutional issues associated with separation of church and State that would arise due to the use of State funds for tuition payments at sectarian schools. (See *Committee for Public Education & Religious Liberty v. Nyquist* (1973), 413 U.S. 756, 37 L. Ed. 2d 948, 93 S. Ct. 2955 (payments to low-income parents for reimbursement of private religious school tuition violates Federal constitution); see also *People ex rel. Klinger v. Howlett* (1973), 56 Ill. 2d 1, 305 N.E.2d 129 (State grants to low-income parents for education costs incurred at nonpublic sectarian schools violates establishment clause of Illinois Constitution of 1970). But see *Davis v. Grover* (1992), 166 Wis. 2d 501, 480 N.W.2d 460 (statutory experimental voucher system limited to private, nonsectarian schools upheld by Wisconsin Supreme Court).)[5] As noted in the *amicus* brief, the plaintiffs also fail to confront the deleterious impact which would ensue if all students claim, as the plaintiffs do, that they are receiving an inferior education, and if they, too, seek similar re-allocation of funds. This could well result in substantial loss of public funds to the public school system. For

---

[5]The statutes governing the Milwaukee Parental Choice Program were amended in July of 1995 to include participation by religious-based sectarian schools. The constitutionality of this amendment has been challenged in an original action before the Wisconsin Supreme Court in the cause of *Thompson v. Jackson*, No. 95—2153—OA; and its implementation has been preliminarily enjoined pending a determination on the merits.

example, the Chicago public school system would be hard pressed to retain existent educational programs for students that remained in its system in the wake of decreased funding. Moreover, those children unable to meet the minimum standards of private schools and those children with learning disabilities, who are more expensive to educate, would remain in the public school system already financially overburdened.

As noted above, the creation of school systems and the matter of their financing and administration are clearly legislative prerogatives that require specialized knowledge. (*Cronin v. Lindberg* (1976), 66 Ill. 2d 47, 360 N.E.2d 360.) In this regard, we adopt the following language from *San Antonio Independent School District v. Rodriguez*:

> "[W]e stand on familiar grounds when we continue to acknowledge that the Justices of this Court lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenues. ***
>
> *** Education *** presents a myriad of 'intractable economic, social and even philosophical problems.' *Dandridge v. Williams* [(1970), 397 U.S. 471, 487, 25 L. Ed. 2d 491, 503, 90 S. Ct. 1153, 1163]. The very complexity of the problems of financing and managing a statewide public school system suggests that 'there will be more than one constitutionally permissible method of solving them,' and that, within the limits of rationality, 'the legislature's efforts to tackle the problems' should be entitled to respect. *Jefferson v. Hackney* [(1972), 406 U.S. 535, 546-47, 32 L. Ed. 2d 285, 296, 92 S. Ct. 1724, 1731]. On even the most basic questions in this area the scholars and educational experts are divided. *** In such circumstances, the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions." (*Rodriguez*, 411 U.S. at 41-43, 36 L. Ed. 2d at 48-49, 93 S. Ct. at 1301-02.)

In any event, in view of our holding that the plaintiffs' complaint fails to state a cause of action, we need not address the merits of plaintiffs' suggested remedy nor need we address the availability of any alternative remedies.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

COUSINS, P.J., and McNULTY, J., concur.